CASEY *v.* CASEY

[No. 213, October Term, 1955.]

*Decided July 11, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Leonard T. Kardy* for the appellant.

*Vivian V. Simpson,* with whom were *Joseph B. Simpson, Jr.,* and *Simpson & Simpson* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Charlotte G. Casey from a decree providing for the custody of her minor child, Douglas R. Casey.

On February 2, 1955, by a decree, signed by Judge Stedman Prescott, Bernard Eugene Casey was divorced *a vinculo matrimonii* from Charlotte G. Casey. The custody and guardianship of the minor children of the parties, Douglas R. Casey, born May 5, 1946, and Margaret Rose Casey, born January 14, 1949, were granted to Charlotte G. Casey with the right of Bernard Eugene Casey to visit said children and to have them visit him in accordance with the supplemental

agreement between the parties. The chancellor further ratified a supplemental agreement between the parties fixing the amount that Bernard Eugene Casey was to pay to his wife as alimony and for the support of the children.

On October 24, 1955, Charlotte G. Casey, the appellant here, filed in the divorce case a motion asking that Bernard Eugene Casey, the appellee here, show cause, if any he had, why he should not be adjudicated in contempt of court for his failure to comply with the provisions of the divorce decree by which he was required to pay to the appellant the sum of $583.33 each month for her support, and the sum of $166.66 each month for the support of the children, the total being $749.99 each month. The motion alleged that for the months of July, August and September, 1955, the appellee had paid to the appellant the sum of $300.00 a month or a total of $900.00, leaving arrearages to date in the amount of $1,349.97.

To the show cause order issued on that motion, the appellee answered tendering all amounts due under the divorce decree and stated that he was ready and willing to abide by all other and further orders of the court; that he did not intend to be put in contempt of court and submitted the amounts due under the decree subject to the further order of the court. In his answer he further stated that for a long period of time prior to the filing of the bill of complaint under an agreement with the appellant, the infant children had been living with Mrs. Casey in Chicago, Illinois. He further alleged that the appellant over a long period of time conducted a campaign of vilification against him in the presence of the infant children. Notwithstanding the fact that the appellant knew the appellee was anxious to have Douglas visit him at his home in Montgomery County, Maryland, during the months of July and August, she used her influence to estrange the children from him, when Douglas was to visit him. As a result of the vilification by the appellant, Douglas became hysterical and refused to visit him and stated that the appellee was not his father. He further alleged that the appellant was not a fit person to have the complete custody of the children and asked that the custody of the infants be

awarded to him and that the former decree of the court be modified accordingly.

The appellant then filed an answer to the appellee's answer in which she denied the material allegations therein and asked for counsel fees and expenses for further costs. After further proceedings and after hearing in open court the chancellor, Judge Kathryn J. Lawlor, decreed on December 20, 1955, that, as Mr. Casey had tendered all sums due, the aforesaid petition of the appellant filed on October 24, 1955, be dismissed. She further decreed that it was to the best interest of the infant, Douglas, that he be placed in the custody of his father, the appellee. She further decreed that the appellee should have the guardianship and custody of Douglas provided the appellant have the privilege of having said son visit her and of visiting said son at any and all reasonable times except that during the period of sixty days following the entry of the decree the appellant should not visit said son without prior order of the court first had and obtained. She further ordered that the appellant should have the guardianship and custody of the infant child, Margaret Rose, provided the appellee have the privilege of having the daughter visit him and of visiting with the daughter at any and all reasonable times. She further ordered that as long as the appellee had the guardianship and custody of Douglas, he should pay to the appellant the sum of $100.00 per month for the support and maintenance of Margaret Rose and that the appellee should continue to make the payments of alimony as set forth in the original decree passed on February 2, 1955, until further order of the court. From that decree the appellant, Charlotte G. Casey, on January 17, 1956, appealed here. She claims that the custody of Douglas should not have been awarded to the appellee, but to her.

In the testimony before the chancellor on December 2, 1955, the appellee testified that he attempted to visit the children once a month in Chicago and on these visits the appellant would accuse him of not supplying sufficient clothes for the children and would tell them in his presence that he was not their father and that he hated them. She also

told the children that they should not visit their father on his farm on account of the rattlesnakes and ticks. When he requested that Douglas visit him on the farm, Douglas replied that he did not want to go to the farm, that he was afraid of rattlesnakes and ticks, and did not want to be locked in the barn. Douglas further said that Mr. Casey's children by a former marriage would torture him. The children by appellee's former marriage were one daughter thirty years old, another daughter twenty-two, another twenty, and a son aged sixteen. None of them lived on his farm. Douglas had not been on the farm for five or six years. When he called Douglas on the telephone and asked that he visit him, the boy replied that he did not want to go to the farm and that Mr. Casey was not his father. In a subsequent telephone conversation he told his father that he would not go with him, that he would run away, and jump out of any vehicle. Appellee further testified that before the hearing he saw his children in the hall and kissed Margaret Rose and attempted to repeat this with Douglas. The boy told him he did not want anything to do with him. The boy had been taught to hate and despise him. He further testified that Mrs. Casey was unable to control or discipline Douglas. He also said that Douglas' record in school was excellent, although he was neurotic. He further stated that during the hearing in the hall, outside the court room, his son called him "a lousy rat", stepped on his feet several times, and grabbed some papers out of his pocket.

The appellant testified that Mr. Casey had never spent a Christmas with her and the children since the children were born. In June and July of 1955 Mr. Casey called Douglas several times on the telephone. She asked Mr. Casey when he was coming to pick up Douglas and he replied that he was not going to pick him up because Douglas had threatened him. She later called Mr. Casey's home and the telephone was answered by his mother. Douglas asked to speak to his father but he was not there. Douglas told his grandmother that he had changed his mind and wanted to go to the farm. Appellant said that when Douglas was three or four years

old his father took him to the farm and Douglas told her that Mr. Casey's son, Gene, and another boy, put him in the bull's stall, locked him in, started to pound on the door, and told him the bull was after him. Douglas made this statement in the presence of Mr. Casey's mother. Mrs. Casey further testified that the health of the children was good and that she had no trouble in managing them. She denied that she vilified her husband and when he visited the children "everything was wonderful." She further stated that she had encouraged Douglas to visit his father. Mr. Casey had not been to visit the children since April, 1955. He called the children on the telephone several times between April and the middle of July and they would ask him when he was coming to see them. He would reply that he would be there in about two weeks but he never came. She said the reason Douglas was rude to his father in the hall during the hearing was because he blamed him for the divorce. She heard Douglas call his father a liar two or three times outside the court room. At that time Douglas acted in a very unusual manner.

Thereafter the child was examined by Dr. Hanna Colm, a child psychologist, whose report dated December 7, 1955, was mailed directly to the court. The report stated that she saw Douglas and gave him a Rorschach examination. "Mr. Casey could only report on the family situation in very short outlines. There was only an hour's time for this consultation. A thorough study of the situation could not be made, and I feel that I am only in the position to offer some impressions of the situation and an evaluation of Douglas' Rorschach study. Douglas came into my room showing immediately great suspicion as to 'what this was all about'. He was not going to be trapped into anything. He would fight for his rights and independence,—nobody is going to force him, he knows what he wants and needs! He explained immediately that he wants to stay with his mother: 'because he stayed with her all his life.' He explained that he loved both his parents but was more attached to his mother 'because he stayed with her all his life'." He dreaded a change of situation but wanted to stay for six weeks with his father in the

summertime. He could not work in any school other than the old school where he had always been. The Rorschach test suggested that he was a very sick child, "longing for peace and a home with both parents and especially for a 'good mother'." The test showed that he was very interested in archaeology, which showed a longing for a time "long ago". This interest was a defense against a feeling of worthlessness. He was under an enormous stress not to make a mistake by being a failure toward both parents. The test also showed that the child needed help and that he unconsciously felt that his staying with his mother was not wholesome though he consciously attempted to be fair and evenly loving to both parents. "The father seems willing to let the child have psychiatric help—it seems to me the mother would possibly not be open to psychiatric help. This fact might help decide with whom Douglas should live. In this case I felt Douglas would be severely endangered in his mental health and in his further wholesome mental development. A boarding school with psychiatric help not available does not seem advisable to me."

The chancellor on March 16, 1956, after the decree was filed and the appeal taken to this Court, filed a Supplementation of the Record in which she stated that differences had arisen as to whether the record in the case truly disclosed what occurred in the hearing before her. She said that during the cross examination she stated that she would like to question Douglas. Counsel for Mrs. Casey requested that one representative of each of the parties be present while the court questioned the child. The chancellor stated that counsel had a complete right to remain but it was her experience that the child would speak more freely to the court if counsel were not present. Counsel for Mr. Casey announced to the court that it was satisfactory to Mr. Casey and to counsel that the child be interrogated by the chancellor out of the presence of all counsel. Mrs. Casey's counsel asked that at least the court reporter remain during the interrogation. The chancellor again stated that all parties had the right to have the reporter present, but that the court felt that the

child would speak more freely if the interrogation took place without anyone present except the chancellor and the child. This procedure was assented to by counsel for Mr. Casey. Counsel for Mrs. Casey interposed no objection. The chancellor at that time advised counsel that if they had any specific questions they desired to have asked the child, she would be glad to so inquire. None was offered. She stated that after the interview with the child, she would advise all parties concerning the result of the interview and either party would have a right to offer further testimony if he so desired. Thereupon the chancellor interviewed Douglas. The chancellor then told counsel and both parties what had occurred, what the child had said to specific questions concerning his home life, school life and his relationship with his father and mother. She announced that as a result of the interview and the observance of the child's physical actions, which were apparent to all at the time of the hearing, and considering the other testimony offered, she was convinced that the child was emotionally very disturbed and highly excited; that in her opinion he was in need of immediate medical attention, psychiatrically at least. The chancellor then advised counsel to both parties that she would accept any further testimony if they desired to offer it. None was offered. When the case was called again on December 16, 1955, Douglas having been in the custody of his father, the court again interviewed the child in chambers alone without any question of the propriety of this action being raised by counsel or either party. Thereafter the chancellor advised counsel that she was increasingly convinced, "taking into consideration the testimony that had been presented and recorded, the interview with the child at the previous hearing and personal observations of the child at that hearing and at the one that had just concluded, that the best interests of the child at this time would be to have him remain with his father with the understanding that the father was to arrange for psychiatric care if the psychiatrist so advised and that it further believed and requested that Mrs. Casey not communicate with the child by telephone and advised her that in her letters to the child that she do all in her power to make him happy and not to write on any matter

that would add to his emotional disturbance and further that she in parting with the boy advise him to obey his father and to try to adjust to his new life, that it was the court's belief that it would be to his best interest to remain with him at this time. Mrs. Casey refused to comply. This request was made, for at this hearing it became apparent to the Court from statements made by Mr. Casey and Mrs. Casey that Douglas had seemingly adjusted to his new life with his father until he received a telephone call and letters from his mother; that upon receiving the letters and the telephone call his animosity toward his father again manifested itself. After this statement was made by the Court neither party requested to or did offer any further testimony. The Court then advised Miss Simpson, attorney for Bernard Casey, to draw an order granting custody of Douglas Casey to Bernard Casey with reasonable rights of visitation reserved to the mother, Charlotte G. Casey, but that for a period of time the best interests of the child would be served if the mother were not allowed to visit the child for a period of 60 days for the reason that it was quite apparent that the child became emotionally upset and disturbed when he saw or heard from his mother and that the child should be given an opportunity to recuperate before again seeing her. Mr. Kardy, new counsel for Mrs. Casey, then stated he would like to show from the teachers and sisters in the school the child attended in Chicago that the child did not behave in school the way he had behaved in court. The court stated that she would accept that as a fact and as proven but that additional evidence would not alter the decision that the court had reached that the best interest of the child would be with Mr. Casey."

Of course, it has been stated many times by this Court that the chief concern in the award of custody of a minor child is the welfare of that child. *Carter v. Carter,* 156 Md. 500, 505, 144 A. 490; *Maddox v. Maddox,* 174 Md. 470, 476, 199 A. 507; *Piotrowski v. State,* 179 Md. 377, 18 A. 2d 199; *Stimis v. Stimis,* 186 Md. 489, 491, 47 A. 2d 497; *Miller v. Miller,* 191 Md. 396, 407, 62 A. 2d 293. The mother is usually preferred over the father for custody where the children are of tender years. *Townsend v. Townsend,* 205

Md. 591, 596, 109 A. 2d 765. It was held in *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919, that a child under ten years of age should not be separated from its mother without grave and weighty reasons. Also, it is not the policy of the law to separate young children from each other. *Kartman v. Kartman,* 163 Md. 19, 161 A. 269; *Burns v. Bines,* 189 Md. 157, 165, 55 A. 2d 487, 57 A. 2d 188; *Roussey v. Roussey,* 210 Md. 261, 123 A. 2d 354. The record before us is very incomplete. We have the testimony only of the father and mother and the report of the psychologist, who apparently did not interview the mother. Something should have been shown as to the qualifications of the psychologist. Nor do we have before us the questions propounded to Douglas by the chancellor and his answers. The chancellor told counsel and both parties what had occurred at that interview. It has been suggested that we remand the case without affirmance or reversal under Code, 1951, Article 5, Section 42, for the purpose of taking additional testimony.

However, it is evident that the appellant has not been able to discipline this boy, now ten years of age. His actions during the hearing show that he is more or less beyond his mother's control. Although the attorney for the appellant wanted the opportunity to show from the teachers and sisters in the school the child attended in Chicago that he did not behave in school the way he behaved in court, this fact was conceded by the chancellor. This would only show that in school he was disciplined. It would not shed further light on his discipline while under the control of his mother. The chancellor here had the opportunity to observe both the appellant and the appellee and to hear their testimony in regard to this child. She also had an opportunity to observe the child during the hearing and privately in her chambers. This is peculiarly a case in which the atmosphere of the trial, the appearance of the parties, and the children, is invaluable in reaching a correct and just conclusion. As has been stated many times, if the record in the case left us in doubt, we should not disturb the finding of the chancellor. *McClees v. McClees,* 160 Md. 115, 119, 152 A. 901; *Collins v. Collins,*

184 Md. 655, 42 A. 2d 680; *Cullotta v. Cullotta, supra,* 384.

The decree in this case did not provide that the order for custody of the children was subject to further order of the court. We deem this an essential provision. Douglas is now with his father and jurisdiction of the custody order should be retained by the court for the purpose of determining whether the father's custody is for the best interest of the infant. The chancellor should be able to determine this from time to time. We will therefore affirm the decree with the exception that it provide that the custody of the minor children and the award for their support and maintenance are subject to further order of the court. We will, therefore, affirm the decree in part and reverse it in part.

> *Decree affirmed in part and reversed in part, and cause remanded for the passage of a decree in conformity with this opinion. Costs to be paid by the appellee.*