## RADFORD *v.* MATCZUK

[No. 78, September Term, 1960.]

484

*Decided November 14, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Arthur L. Rhoads, Jr.,* with whom was *D. Franklin Wherley* on the brief, for the appellant.

*Patrick A. O'Doherty* and *William A. Hegarty* for the appellee.

HORNEY, J., delivered the opinion of the Court.

This case involves the narrow but difficult problem of deciding whether the chancellor was correct when he struck from a divorce decree the previously granted right of a natural father to visit his teenage son, who has been in the custody of his mother since birth.

The agreed statement of facts informs us that the parties to this appeal were married in 1946 while the father was in the Armed Forces. (The natural father is the appellant and the mother is the appellee). The child was born in July of 1947, and in 1949 the mother obtained an absolute divorce from the father on the ground of adultery. The decree awarded custody of the child to the mother, subject to the right of the father to visit the child. The father saw the child only once in 1948, (though, according to the report of the probation department, he attempted to see the child again in 1950, but was repulsed by the mother). The father never contributed in any way to the support of the child. In 1947 (two months before the birth of the child) the father was convicted of stealing government property, (and, according to the probation report, served a sentence of eight months and was dishonorably discharged from the service). The father, who

remarried in 1948, now resides in Lynchburg, Virginia. The mother also remarried in 1956, and in 1958 she and her present husband requested the father to consent to the adoption of the child by the stepfather. The father refused and immediately filed a petition to enforce his visitation rights.

The case was referred to a master, who, after a hearing at which he received only the testimony of the parties, referred the matter to the probation department of the division of juvenile causes for investigation and an impartial report.

The substance of the report of the probation department, in addition to the facts heretofore related, shows, among other things, that both a sister of the natural father's present wife and a cousin of the natural father, who reside in small row houses near the Pimlico Racetrack, would welcome the child to their respective homes so that the father might see him. The court officer characterized the relatives as friendly, pleasant and interested persons. One of them thought the child should have an opportunity to know his father, blamed the child's mother for his indifference toward his father, and stated that the mother had refused to accept support for the child from the father. The other relative, who saw the natural father infrequently and had not seen the child since he was a small boy, although she was ready to welcome father and son to her home, was apprehensive that the situation would be rather awkward, but was willing to try to make such visits a pleasant experience for all concerned. The mother and stepfather reside in an attractive two-story brick row house off of Loch Raven Boulevard. The court officer described the contrast between the environment of this home and those of the father's relatives as "appalling." The mother informed the court officer that the child had accepted her present husband as his father and that a close relationship had developed between them as was evidenced by the child's better adjustment in school. The mother was convinced that the stepfather was "good for her son," and for that reason wanted the adoption. On the other hand, the mother emphasized that the natural father was a total stranger to his son and was convinced that visits by the father would not be good for the child. She was apprehensive that such visits would tend to

upset and confuse the child. The mother stated, however, that if the court should rule otherwise, she would want the visits to be at her home because she objected to the drinking that occasionally took place in the homes of the natural father's relatives. The court officer found the child to be a happily-adjusted, mannerly and friendly boy who had accepted the stepfather as his father and had no desire to even see his natural father, let alone to visit him in the homes of people unknown to him. While it was apparent that the child did not know why his mother and father had separated, he stated that his father "wasn't much of a man to do that to my mother." According to the court officer it was evident that the attitude of the child had been influenced by the mother, if not by commission then by omission. The court officer thought that as the child matured and became more independent in his thinking, he might desire to know his father, but at the present time she believed that it would not be conducive to his best interests to force on him "a relationship with a total stranger [meaning the natural father] in the home of strangers [meaning the relatives of the father]."

There was nothing in the record to indicate that the natural father had continued either an immoral or criminal way of life.

On the probation report and the testimony previously taken, the master concluded, as did the court officer who made the investigation, that the best interests of the child would be promoted by not enforcing the visiting rights of the father, and recommended that the petition therefor be dismissed and the original decree modified. In his report, the master also informed the chancellor that the mother was strongly opposed to the child having any contact with the father, that the child had never known the father and that the father during a ten-year period had made no further efforts to see the child.

On the report of the master, the chancellor, having heard the exceptions of the father thereto, overruled the exceptions, dismissed the petition and modified the divorce decree by striking out the provisions that the father should have the "right to see" the child "at all reasonable times."

In effect, the father makes two related contentions: (i) that a parent whose child is in the custody of another should have

a right to visit him unless the best interests of the child would be endangered by such contact; and (ii) that a parent, even though he has failed to exercise the visitation privileges previously granted him by a decretal order, does not lose the privilege thus afforded unless the parent becomes unfit to associate with the child.

The first contention undoubtedly states the general rule. In 2 Nelson, *Divorce,* § 15.26 (2d ed.), it is said:

> "A parent whose child is placed in the custody of another person has a right of access to the child at reasonable times. The right of visitation is an important, natural and legal right, although it is not an absolute right, but is one which must yield to the good of the child. A parent's right of access to his or her child will ordinarily be decreed unless the parent has forfeited the privilege by his conduct or unless the exercise of the privilege would injuriously affect the welfare of the child, for it is only in exceptional cases that this right should be denied. And in the absence of extraordinary circumstances, a parent should not be denied the right of visitation, even though the parent has been guilty of marital misconduct. But when it is clearly shown to be best for the welfare of the child, either parent may be denied the right of access to his or her own child."

See also Keezer, *Marriage and Divorce,* § 723 (3rd ed. Moreland); Sayre, *Selected Essays on Family Law,* p. 616; 17A Am. Jur., *Divorce and Separation,* § 829.

The Maryland cases—though it seems the question of visitation rights instead of arising as a separate and distinct action are usually involved with the whole question of custody rights—are to the same effect. In *Maddox v. Maddox,* 174 Md. 470, 199 Atl. 507 (1938), where the holding was that the best interests of the children required that they be placed in the custody of the paternal grandmother—instead of an institution as the chancellor had decreed—with reasonable visitation privileges to the mother, the Court had occasion to say, at p. 476:

"While the court usually does not deny to a parent the opportunity to visit the child, and occasionally to have temporary custody at suitable times, nevertheless even this comfort may be denied the parent, if the best interest of the child is subserved."

But an examination of the cases involving visitation rights—despite previous acts of misconduct, prior disobediences of decretal orders, repeated failures to make support payments and other derogatory circumstances—discloses that this Court, even though custody was denied, has never had an occasion to deny the right of visitation to an errant parent. See the line of cases beginning with *Hill v. Hill,* 49 Md. 450 (1878) [privilege of access to the child was reinstated for a mother who had been divorced for adultery] and ending with *Hild v. Hild,* 221 Md. 349, 157 A. 2d 442 (1960) [right to have a child visit her was not denied to an adulterous mother who had married her paramour].[1] In other jurisdictions it has been held that it would require the clearest kind of evidence

1. The list, in addition to *Maddox, Hill* and *Hild,* includes among others: *Pangle v. Pangle,* 134 Md. 166, 106 Atl. 337 (1919) [adulterous mother was afforded "frequent opportunities for association" with child]; *England v. Megear,* 145 Md. 574, 125 Atl. 731 (1924) [child permitted to spend part of Christmas vacation with a divorced mother who had remarried in violation of the teaching of the church in which the child had been reared]; *Carter v. Carter,* 156 Md. 500, 144 Atl. 490 (1929) [reasonable access to child was still permitted to a mother who had wilfully violated provisions of former decree allowing access]; *Swoyer v. Swoyer,* 157 Md. 18, 145 Atl. 190 (1929) [adultery of mother did not preclude "reasonable opportunities" of access]; *Barnard v. Godfrey,* 157 Md. 264, 145 Atl. 614 (1929) [visitation rights allowed even after excessively reprehensible behavior toward mother of child]; *McCann v. McCann,* 167 Md. 167, 173 Atl. 7 (1934) [a shiftless father, who had annoyed the mother in seeking child and failed to pay for support of child, was still allowed to visit child at reasonable times]; *Townsend v. Townsend,* 205 Md. 591, 109 A. 2d 765 (1954) [reasonable access to infant should not be denied to adulterous mother unless chancellor was convinced visitations were detrimental]; *McCabe v. McCabe,* 218 Md. 378, 146 A. 2d 768 (1958) [reasonable rights of visitation were granted to adulterous mother who had married paramour].

to justify a complete cutting off of visitation rights of a parent. See, for instance, *Leonard v. Leonard,* 98 A. 2d 638 (Pa. Super. 1953).

Since the courts ordinarily do not deny even an errant parent the right to visit a child at reasonable times unless the best interests of the child would be endangered by such contact, the problem in this case narrows still further to a determination of whether, on the facts in this case, the father has lost the previously granted privilege of access to the child by any present unfitness to associate with him.

In essence, the mother relies on five factors which she contends indicate that the best interests of the child require that the father be barred from further access to the child. These are (1) that the father was the "guilty" party in the original divorce; (2) that the father was convicted of a serious criminal offense; (3) that the child has declared a desire not to see or know his father; (4) that the father did not attempt to enforce his visitation rights until adoption by the stepfather was contemplated; and (5) that the father has in effect abandoned his right to visit the child because of his complete lack of interest in either visiting him or contributing in any way to his support.

The first part of the mother's contention is clearly without merit. The numerous decisions of this Court concerning questions of custody, in which we have consistently held that the adulteries of an errant spouse do not bar him or her from access to a child—where, as in this case, there is no showing that the adulterer has continued on an immoral course of conduct—is a sufficient answer to this contention. The cases in other jurisdictions, where the parent had been denied further access to a child invariably involve a situation where the parent was subsequently found to be guilty of some immoral or other grave misconduct which had clearly abused the privilege. See *McCoy v. McCoy,* 130 Atl. 637 (N. J. Eq.) 1925); *Runsvold v. Runsvold,* 143 P. 2d 746 (Cal. App. 1943).

The second part of the contention is like unto the first in that there is nothing in the record to even indicate that the father continued to live a life of crime after his conviction more than a decade ago for stealing.

The third circumstance in the contention—the desire of the child—even if it has merit, is not controlling. It is true, of course, that the desire of an intelligent child, who has reached the age of discretion, should be given some consideration in determining custody, but even in a custody case the wish is not controlling. *Hild v. Hild, supra; Ross v. Pick,* 199 Md. 341, 86 A. 2d 463 (1952). In this visitation rights case, where the father has asked only that he be allowed to see his son at reasonable times, and where the child has not seen or known his father nor had an opportunity to make an independent choice based on something more than what had been imparted to him by others, we think the wishes of the child should be given slight, if any, consideration. A choice based on emotions inspired by one parent is no choice at all and need not be honored by a court. Cf. *Casey v. Casey,* 210 Md. 464, 124 A. 2d 254 (1956).

The fourth element of the contention—the long delay in seeking further access—besides being devoid of substantial merit, may be susceptible of another explanation than the one seemingly attributed to it by the mother. Instead of being motivated by spite or some manner of obstructionism, as she seems to believe, it may well be that the request to consent to adoption shocked the father into a realization that he was in danger of losing his visitation rights unless he did something about it. In any event, there is nothing in the record to suggest that his motives were improper.

The fifth and final factor of the contention—that the father has abandoned his right to see the child—is the antithesis of the second contention of the father that his failure to assert sooner his rights of visitation does not bar him now unless he is presently unfit to associate with the child.

The three New York cases—*People ex rel. Strauss v. Steindler,* 227 N. Y. S. 726 (App. Div. 1928), *Horner v. Horner,* 49 N. Y. S. 2d 720 (Dom. Rel. Ct. 1944), and *Lieblich v. Lieblich,* 164 N. Y. S. 2d 179 (Sup. Ct. 1957)—relied on by the mother to support her position on the alleged abandonment are clearly either not in point procedurally or on the law or are otherwise distinguishable on the facts.

While there are no Maryland cases in which a decision

affecting visitation rights turned only on an act of abandonment or neglect, there are custody cases which clearly indicate that abandonment is not a bar to the right of visitation. In *Piotrowski v. State ex rel. Kowalek,* 179 Md. 377, 18 A. 2d 199 (1941), where the child had lived with her maternal grandparents ever since she was four months old, and nine years had elapsed during which the father had made only infrequent visits to see the child, suit was instituted by the father for her custody. In reversing a decree in favor of the father, this Court 'ruled that the grandparents should retain custody, but it continued "the privilege to the father to have the child visit him from time to time." So, even though the father had neglected the child for nine years, and was denied custody, we recognized that the right of the father to have access to the child should not be terminated. See also *Dunnigan v. Dunnigan,* 182 Md. 47, 31 A. 2d 634 (1943), where the father, having abandoned his children for three years, was still allowed a right to see them. And see *Wilhelm v. Wilhelm,* 214 Md. 80, 133 A. 2d 423 (1957), where the period of abandonment or neglect by the father had been five years.

But there are cases in other jurisdictions bearing directly on the question of abandonment. In *Commonwealth ex rel. Turner v. Strange,* 115 A. 2d 885 (Pa. Super. 1955), a mother, who had not seen the children for seven years, excepting chance meetings, and had done very little in the way of recognizing their birthdays and the holidays, sought to enforce her visitation rights, but the lower court denied her the privilege. In reversing the decision, the Superior Court of Pennsylvania said at p. 886:

> "The trial court concluded that * * * [the mother] 'abandoned' the children, citing several adoption cases as authority. This is not an adoption case, and the principles applied in those cases have no relevancy to the question before us. It is not the law that a parent who abandons her children loses thereby the right of visitation."

See also *In Re Duckworth,* 146 A. 2d 365 (Pa. Super. 1958) ["The mere fact that * * * (the mother) has not had contact

with the children for some time will not justify the denial of visitation rights"] ; *Commonwealth ex rel. Boschert v. Cook,* 186 Atl. 229 (Pa. Super. 1936) [the neglect or abandonment of a child for nine or ten years did not deter the Court, in a custody case, from affording the father and paternal grandparents an opportunity to visit the child and to have the child visit them at convenient times].

In *Wilson v. Wilson,* 252 P. 2d 197 (Idaho 1953), where the facts were essentially the same as in the case at bar, a divorced mother, having custody of the child, subsequently remarried and then sought to put an end to the visitation rights of the father, who had moved out of the state and had not seen the child for five years, so as to pave the way for the stepfather to adopt the child. There was no showing that the right of visitation would create a situation or influence detrimental to the welfare of the child. In reversing the lower court order terminating the rights of the natural father, the Supreme Court of Idaho stated that the question was "not one of the right of adoption, or even custody, but involve[d] the naked right of a father to visit and see his own child."

In the instant case, since there was no showing that the best interests of the child would be endangered by the father seeing the child or that the father is presently unfit to associate with his son, we think it is clear that the expunged visitation rights of the father must be restored to him. In the exercise of our best judgment in determining whether the decision of the chancellor was "the best one" (*Ex Parte Frantum,* 214 Md. 100, 133 A. 2d 408 [1957] at p. 105) as well as "the correct one under the law" (*Hild v. Hild,* 221 Md. 349, 157 A. 2d 442 [1960] at p. 359) as applied to the facts in the present case, we think the decision was not correct. We fully appreciate the efforts of the mother and her present husband to build a secure future for the child, and we can understand their misgivings over the results the visits of the father may engender. We think it is clear, however, under the law and on the record, that the father cannot be deprived of the right to see his son.

We hold that the provisions allowing the father to visit his son should not have been stricken from the divorce decree.

For that reason we must reverse the order striking out the visitation rights from which this appeal was taken, and remand the case for the entry of an order allowing the father reasonable access to the child upon such terms as the chancellor may prescribe. In so doing, he can decide whether the visits should take place in the homes of relatives of the father or in the home of the mother and stepfather of the child as well as the frequency and duration of such visits.

> *Order reversed and case remanded for the entry of the order directed by the opinion; the appellant to pay the costs.*