# PHILIP E. ATKINSON, JR. *v.* FRANCES ATKINSON

[No. 646, September Term, 1970.]

*Decided September 27, 1971.*

66

The cause was argued before MURPHY, C. J., and MORTON and GILBERT, JJ.

*F. Duncan Cornell* for appellant.

*G. Joseph Sills, Jr.,* for appellee.

MORTON, J., delivered the opinion of the Court.

This in an appeal by the husband from a denial by the Circuit Court for Baltimore County of his petition to terminate support payments to his former wife. The petition alleged that on December 3, 1964, the husband had been granted a divorce *a vinculo matrimonii* from the wife on the ground of voluntary separation (Md. Code, Art. 16, § 24) ; that he had been awarded custody of their minor child; and that the divorce decree incorporated a provision of the separation agreement executed by the parties prior to the divorce that he would pay to the wife the sum of $260 per month for her separate maintenance and support which was to continue for the joint lives of the parties or until the wife should remarry.

The husband's petition further alleged that his former wife "was living with a certain male person at 1803 Aberdeen Road, Loch Raven Village Apartments, Baltimore, Maryland, without benefit of clergy and your petitioner believes and therefore avers that said relationship is not

being legalized by marriage for the reason, among others, that to legalize said relationship would defeat the defendant's right to receive additional alimony under the said agreement."

In her answer to the petition, the wife entered a general denial of this latter allegation and the case came on for hearing before Judge John N. Maguire.

The husband testified that he had no personal knowledge of the wife's alleged conduct except that on the door of the apartment in which she lived, he had seen her name and that of John Van Woodson, "not Mr. and Mrs. The two names are on the door."

He had, however, retained a private detective to follow his wife and the detective testified that on July 8, 1969, he began a surveillance of the apartment. Upon arrival, he observed the wife's Valiant automobile and a Chrysler automobile which he determined to be owned by John Van Woodson. He observed their separate names on the door of the apartment and at 7:40 p.m., observed the wife and Woodson leave the apartment in Woodson's car, drive to several shopping areas where they made purchases and return to the apartment at 9:43 p.m. He testified that all lights in the apartment were turned off at 1:20 a.m. and he discontinued the surveillance shortly thereafter. He returned at 6 a.m. on July 9, 1969, heard the wife and Woodson conversing at 11:30 a.m. and observed the wife come out of the apartment and empty a garbage can at 12:20 p.m. According to the detective, at 1:05 p.m. the wife and Woodson again left the apartment in Woodson's car and this completed the detective's surveillance of the apartment.

The 20 year old daughter of the parties was called by the husband and testified that although she was now living alone, she had lived with her father immediately after the divorce. She stated that late in 1968 she went to live for one month in her mother's apartment during which time her mother was away a week or two. While her mother was in the apartment, Woodson visited from time

to time and spent one night there. According to the daughter, the apartment was a studio type consisting of one large room with kitchenette, a small dressing room (which had no bed) and a bathroom. On the occasion that Woodson spent the night in the apartment, "there was a sofa bed that was pulled out and the three of us slept on the sofa bed." She further testified that when her mother was away from the apartment, she would go to Pennsylvania and stay in an "office trailer", owned by Woodson, situated in a trailer camp. She had visited her mother there a number of times and on two occasions Woodson was there and spent the night. "The first time my mother and I slept in the living room on the fold-out sofa, and the second time I slept in a small room and they slept in a room in the back." When asked to describe her mother's relationship with Woodson, she replied: "They were living together most of the time." When asked if she had talked with her mother about marrying Woodson, she replied: "One time she said she liked the relationship they had at the present time, the fact that they were not married, and then she contradicted herself at other times and thought of marriage."

There was also evidence developed at the hearing below to show that the wife and Woodson had joint bank accounts in their respective names and that the telephone in the apartment was listed under Woodson's name.

Several depositions of witnesses who lived in the Pennsylvania trailer camp were introduced and these witnesses stated that they were not under the impression that the wife and Woodson were husband and wife but that the trailer was used as his business office and their relationship was that of employer and secretary.

The wife called no witnesses and did not herself testify.

The appellant-husband contends that the evidence adduced by him established that the wife and Woodson "were living together as a man and wife would and that they were doing this openly and notoriously" and asserts

that by such conduct, the wife has forfeited her right to "continue to receive the alimony called for in the court's decree." He concedes that "on the precise point, Maryland law is silent" but suggests that "the Court of Appeals has touched upon the issue in *Courson v. Courson*, 213 Md. 183."

In *Courson* the wife had been divorced *a mensa et thoro* from the husband and awarded permanent alimony of $25 per week. Thereafter she committed adultery and the husband petitioned for and was granted a suspension of the alimony payments. Judge Prescott, speaking for a divided Court, stated at 187-188:

> "There is a long line of decisions and authorities that hold where there is no absolute divorce, adultery by the wife is a defense to her suit for separate maintenance and support, or it will justify a modification or revocation of a decree for alimony."
>
> \* \* \*
>
> "In this State, a limited divorce is one from bed and board. It grants unto the injured spouse the right to live separate and apart from the one at fault. However, the parties remain *man* and *wife*, and there is no severance of the marital bonds. Alimony stems from the common law duty of a man to support his wife, and, in Maryland, has always been considered as outlined above. We hold the proper rule, supported by reason and authority, is that when a wife, who is living separate and apart from her husband due to his fault and who has obtained no more than a limited divorce from him, commits adultery, she forfeits her right to her husband's support and the future payments of alimony."
>
> \* \* \*
>
> "It will be noted, we have not been required in this suit to pass upon the right of a wife, who has been granted an absolute divorce and

alimony and who thereafter commits adultery, to continue to receive support from the former husband, and express no opinion thereon at this time."

On the other hand, Judge Henderson in his dissent, concurred in by Judge Hammond, the present Chief Judge, stated at 190-191:

"This is a case of first impression in this State, and on principle and authority I think the decision is unsound. A right to support may survive a dissolution of the marriage, which would free her from a duty of chastity. * * * It is generally held that adultery of a wife committed after an absolute decree is not a bar to its enforcement. *Cole v. Cole*, 31 N. E. 109 (Ill.). Cf. *Rang v. Rang*, 211 Ill. App. 385; *Christiano v. Christiano*, 41 A. 2d 779 (Conn.); *Suozzo v. Suozzo*, 1 A. 2d 930 (N. J.); *Hayes v. Hayes*, 115 N. E. 1040 (N. Y.). See also *Browne, Divorce and Alimony* (1890), pp. 16, 296. Other cases are collected in a note, 6 A. L. R. 2d 859. * * * In some states it is held that the courts may exercise discretion in modifying or rescinding an award after an absolute divorce, in cases of flagrant misconduct, such as living with a paramour or in prostitution. *Lindbloom v. Lindbloom*, 230 N. W. 117 (Minn.); *Haritos v. Haritos*, 202 N. W. 181 (Wis.). In a few states the existence of such resources is merely viewed as bearing upon the need for support, not upon the question of liability."

Judge Henderson concluded at 194:

"The question whether an award might be terminated under circumstances shocking to the conscience of the court and outraging public morals may be left open."

Thus, as a result of the three to two decision in *Courson*, it would appear that under our existing case law the adultery of a wife, prior to an absolute divorce, constitutes a ground for revoking a prior award to her of permanent alimony. But in the case before us, we are confronted with an absolute divorce and the rationale of the majority view in *Courson*, which was confined to an *a mensa* divorce, does not necessarily extend, as the majority of the Court was at pains to assert, to acts of misconduct committed by a wife after the marriage has been totally dissolved.

From a review of the cases throughout the country and the text authorities, it is apparent that the effect of a wife's "misconduct" after an *a vinculo* divorce is not firmly settled.

In *Schouler, Divorce Manual,* (1944) at 423, it is said: "Under some circumstances the husband may be relieved of the requirement that he pay alimony to his wife by reason of her subsequent misconduct. This rule, however, does not seem to have been generally applied."

In *Nelson on Divorce,* §§ 17, 19, page 92, it is stated: "Conduct of an ex-wife which would be unbecoming were she still bound by marital ties is not ground for modification of alimony or support provisions of a decree which has severed those ties."

On the other hand, in an Annotation in 6 A.L.R.2d 859, it is stated: "There is a marked conflict of authority on the question whether the fact that a divorced wife is guilty of immoral conduct after the divorce is a ground for reducing or terminating alimony payments. Perhaps a majority of the courts state that such conduct is a ground for modification, although some of the decisions are mere dicta."

The appellant's principal argument is premised upon his assertion that the evidence established that the wife and Woodson were openly and notoriously living together as husband and wife and that their proved relationship amount to "flagrant misconduct." His premise, however,

was not subscribed to by the Chancellor below nor supported by the Chancellor's factual findings. In the course of reaching his decision to dismiss the husband's petition, Judge Maguire concluded that on the evidence before him it could be inferred that sexual relations occurred on July 8, 1969, when the wife and Woodson were in the apartment alone, and again when they shared the same bed in the trailer in Pennsylvania. He did not find any evidence that the wife was guilty of "flagrant misconduct" such as "prostitution", nor did he find "a continuous holding out in the community by her and him as man and wife [which] would be some indication [of flagrant misconduct] but that is not before me." As Judge Maguire described the situation, "an isolated incident of being together and staying together and having sexual relations, to this Court, is not flagrant misconduct on her part because of her status of being single. It may be on her own conscience and her own problem. That is not before me; that is not my problem. I do not see in this particular case that she is continually living with anyone and that there is on her part flagrant misconduct."

Flagrant misconduct has been described as living in prostitution, *Courson, supra;* living together as husband and wife when unmarried, *Grant v. Grant,* 126 P.2d 130 (Cal. 1942) ; living openly and notoriously with a paramour, *Lindbloom v. Lindbloom,* 180 Minn. 33, 230 N.W. 117 (1930), *Weber v. Weber,* 153 Wis. 132, 140 N.W. 1052 (1913) ; or gambling or squandering alimony payments, *Daniels v. Daniels,* 351 P.2d 236 (Idaho, 1960).

Here, the Chancellor found as a fact, and we cannot say his finding was clearly erroneous, that the evidence adduced by the husband did not support the factual allegation of his petition that the wife was "living with" Woodson or support the husband's argument that "they are living together as a man and wife would * * * openly and notoriously." Thus, the case does not reach this Court in a factual posture which would compel us to find that the Chancellor was clearly erroneous in his finding that

the wife's conduct did not measure up to the traditional, legal definition of flagrant misconduct. Accordingly, we have no occasion to determine whether the so-called flagrant misconduct, *vel non*, of a former wife may serve as a basis for revoking or modifying a prior award of alimony.

Under the circumstances and on the state of the record before us, we cannot find that the Chancellor below erred in denying the husband's petition to be relieved of his obligation to make the monthly payments to the wife called for by the original divorce decree.

*Order affirmed.*
*Appellant to pay the costs.*