SALLY L. ROBERTS *v.* JOHN S. ROBERTS

[No. 681, September Term, 1976.]

*Decided April 11, 1977.*

The cause was argued before DAVIDSON, MELVIN and LISS, JJ.

*Ann M. Turnbull* for appellant.

*James N. Vaughn* for appellee.

LISS, J., delivered the opinion of the Court.

I Kings, Chapter 3 of the Bible, relates that King Solomon dreamed that the Almighty appeared before him and expressed His approval of the efforts of Solomon, His good and faithful servant. The Lord asked Solomon what gift He could give to him and Solomon replied at Verse 9, "Give therefore thy servant an understanding heart to judge thy people that I may discern between good and bad." This case cries out for the wisdom of Solomon and an "understanding heart."

The controversy arises out of the "second thoughts" which so frequently occur after a "quickie divorce" has been obtained by Maryland residents in more hospitable jurisdictions.

Sally L. Roberts, appellant (wife), and John S. Roberts, appellee (husband), were married in Maryland on September 27, 1950. They were the parents of four children, two of whom were minors, when the divorce decree dissolving their marriage was signed. The parties separated in January, 1972, and in August, 1972, they entered into a voluntary separation and property settlement agreement by the terms of which the appellant was given the home owned by the parties and custody of the minor children and the appellee agreed to make certain monthly payments for their support and maintenance. At trial the appellee testified, that about six weeks after the separation agreement was signed, his wife's next-door neighbor called him on the telephone and told him that his minor children were at her house. In response to the telephone call Mr. Roberts went to the neighbor's house finding the children in a deplorable state

and temporarily took them to stay with his relatives. Several days later a divorce decree was issued by a court in Santo Domingo, Dominican Republic, to which jurisdiction the parties had submitted themselves. The separation agreement between the parties was adopted by the Santo Domingo court and made a part of the divorce decree. Shortly thereafter the appellee remarried and brought the children to live with him, his new wife and her three children by a previous marriage.

Paragraph seven of the separation agreement between the parties provided that "Husband shall pay directly unto Wife, and not through the Probation Department of any Court, as permanent alimony, the sum of Five Hundred and Fifty Dollars ($550.00) each month until the first to occur of any one of the following events: (a) remarriage of Wife or (b) death of either of the parties." Mr. Roberts made the alimony payments as agreed until May, 1974, when all payments to the wife ceased.

In September, 1974, the appellant filed a Bill of Complaint in which she sought specific performance of the voluntary separation and property settlement agreement. In November, 1974, Mr. Roberts filed an answer to the original Bill of Complaint and a Counter Bill in which he petitioned the court to award him permanent custody of the minor children and to rescind that portion of the separation agreement which required him to pay permanent alimony to appellant. An answer was filed by appellant and the case came on for trial before Judge T. Hunt Mayfield. The case was referred to the Howard County Department of Social Services for an investigation and report. The report was substantially delayed and in the meantime Judge Mayfield retired. It was not until May, 1976, that the case was tried de novo in the Circuit Court for Howard County. At the time of trial, Mr. Roberts was 24 months in arrears on alimony payments, the arrearages amounting to more than $13,000.

It is undisputed that the parties' youngest child, who is now eight years old, has required special schooling and psychiatric help for a long period of time, and that the expenditures made on his behalf by the father have been

substantial. Mr. Roberts stated that he stopped paying alimony because of these expenses; but he admitted that these problems did exist at the time he entered into the separation agreement, and that he knew that substantial therapy would be required when he agreed to pay appellant the monthly alimony stipulated in the agreement. The evidence disclosed that appellant had never worked during the 22 years of the marriage but that after her divorce she was forced to take a job as a pantrycook at a take-home salary of $87.87 per week. She worked until May, 1975, when her job was abolished, and thereafter was paid unemployment compensation of $65 per week until the expiration of her eligibility in March, 1976. At the time of trial she was unemployed and had no source of income.

Mr. Roberts is vice president of a corporation and has earned a salary of $30,000 a year since 1971. In 1974 he received a bonus of $12,500 which he stated was expended in the installation of a swimming pool in his home (market value of $180,000 and titled in his second wife's name). His present wife receives the sum of $450 per month from her former husband for the maintenance and support of her three minor children who live with the Roberts.

The appellant did not oppose the custody of the children being awarded to the husband, but she requested that the court set up a schedule of visitation rights for her. The record revealed that she had seen the children only once since the husband assumed their care in 1972.

The husband in his testimony contended that his former wife was an alcoholic, that she had a "drinking problem" for many years, and that she was frequently drunk. The report from social services indicated that she "occasionally" attended sessions at the Alcohol and Drug Abuse Center. The appellant admitted that while she did drink occasionally when she had the children in 1972 that it was "not that much, really."

At the close of testimony, the trial court issued its memorandum and decree in which it stated, "[I]t is the opinion of this [c]ourt that the best interest and welfare of the minor children ... shall be served by awarding custody

of them to their father, . . . rights of reasonable visitation by their mother . . . being suspended, subject to the further order of this [c]ourt." The court continued:

> "It is the opinion of this Court that Sally L. Roberts has an alcoholic problem and a propensity toward flagrant misconduct who, if awarded current and future alimony payments, would spare no efforts to squander them. As a result, it is the judgment of this Court that current and future alimony payments shall be suspended, subject to the further order of this Court."

Then, differentiating between current and future alimony and past due alimony, the chancellor directed as follows:

> "In the matter of alimony past due, however, this Court must act in the present and in reference to the ability or inability of parties to earn or provide. While the capacity on the part of John S. Roberts to pay has been materially reduced, the circumstances of Sally L. Roberts are dire. To cancel unpaid, past due arrearages, in light of the respective positions of the parties, would constitute a disregard.
>
> Sally L. Roberts, because of her alcoholic problem, has made herself destitute.
>
> John S. Roberts, on the other hand, has shown an ability to earn a substantial income and an ability to eventually pay the alimony payments which are in arrears and cannot be excused from making those payments which are past due.
>
> Monthly payments of $275, without interest, by John S. Roberts, to Sally L. Roberts, will help to sustain Sally L. Roberts for a period of four years and thus afford her time within which to rehabilitate herself, if such shall be the nature of things to come."

The appellant urges two reasons why the chancellor erred in suspending her current and future alimony payments.

She contends that his finding of fact that the appellant has an alcohol problem and propensity toward flagrant misconduct was not supported by the evidence and was therefore clearly erroneous; and that even if these findings were correct that this should not result in a forfeiture or suspension of her right to current and future alimony payments.

An alcoholic has been defined as "one who is unable *consistently* to choose whether he should drink or not, and who if he drinks, is unable *consistently* to choose whether to stop or not." Obviously, the more that drinking affects the health, the emotional well-being, the personal relationships, the work and the financial situation of the individual, the more serious the alcohol problem becomes. Alcoholism, as such, is not a symptom of basic mental instability.[1] A complicating factor has been the existence of a double standard which makes it "worse" for a woman to be an alcoholic than for a man. Society's judgment of the alcoholic woman has always been harsher than that of the male alcoholic. We have tended to conceal or deny the problem of the woman alcoholic even though it has been estimated that fully 50 per cent of the alcoholic individuals in the United States are women.[2] A 1973 study drew this profile of an alcoholic female:

> "The potential female alcoholic experiences chronic doubts about her adequacy as a woman. These doubts arise in part from inadequate feminine identification on an unconscious level, and they may be enhanced by acute threats to her sense of feminine adequacy, *such as marital problems,* a miscarriage, or children leaving home. The potential alcoholic does not consciously reject her identity as a woman; rather she consciously values traditional female roles. She may manage to cope with her fragile sense of feminine adequacy for a number of years, but when some new threat severely exacer-

1. U.S. Department of Health, Education, and Welfare, *Alcohol Abuse and Women* (1975).

2. *Id.* citing Dr. Marvin Block, former chairman of the American Medical Association's Committee on Alcoholism.

bates her self doubts, she turns to alcohol in an attempt to gain artificial feelings of womanliness." (emphasis supplied) [3]

We have carefully considered the record in this case and agree that, while the evidence is not as conclusive as we might have preferred, there is sufficient evidence to justify the chancellor's finding that the appellant did in fact have an "alcohol problem." The chancellor, however, went further; he concluded that the appellant had "a propensity toward flagrant misconduct," basing that conclusion on the reasoning and holdings in *Atkinson v. Atkinson*, 13 Md. App. 65, 281 A. 2d 407 (1971). For the first time in Maryland — as far as we have been able to determine — the chancellor on the authority of *Atkinson* suspended the appellant's right to current and future payments of alimony required by the separation agreement between the parties.

The progenitor of *Atkinson* was *Courson v. Courson*, 213 Md. 183, 129 A. 2d 917 (1957). In that case a wife had been divorced a mensa et thoro from her husband and awarded permanent alimony. Thereafter she committed adultery and the husband petitioned for and was granted a suspension of the alimony payments. In a three to two decision the Court of Appeals stated at 187-88, 129 A. 2d at 919-20:

> "There is a long line of decisions and authorities that hold where there is no absolute divorce, adultery by the wife is a defense to her suit for separate maintenance and support, or it will justify a modification or revocation of a decree for alimony."

> \* \* \*

> "In this State, a limited divorce is one from bed and board. It grants unto the injured spouse the right to live separate and apart from the one at fault. However, the parties remain *man* and *wife*,

---

**3.** Wilsnak, S. C., Femininity by the Bottle, *Psychology Today*, 6(1):39-43, 1973.

and there is no severance of the marital bonds. Alimony stems from the common law duty of a man to support his wife, and, in Maryland, has always been considered as outlined above. We hold the proper rule, supported by reason and authority, is that when a wife, who is living separate and apart from her husband due to his fault and who has obtained no more than a limited divorce from him, commits adultery, she forfeits her right to her husband's support and the future payments of alimony."

\* \* \*

"It will be noted, we have not been required in this suit to pass upon the right of a wife, who has been granted an absolute divorce and alimony and who thereafter commits adultery, to continue to receive support from the former husband, and express no opinion thereon at this time."

The dissent in *Courson* sharply disagreed with the holding of the majority. The minority position was stated by Judge Henderson at 190-91, 129 A. 2d at 921:

"This is a case of first impression in this State, and on principle and authority I think the decision is unsound. A right to support may survive a dissolution of the marriage, which would free her from a duty of chastity. \* \* \* It is generally held that adultery of a wife committed after an absolute decree is not a bar to its enforcement. *Cole v. Cole*, 31 N. E. 109 (Ill.). Cf. *Rang v. Rang*, 211 Ill. App. 385; *Christiano v. Christiano*, 41 A. 2d 779 (Conn.); *Suozzo v. Suozzo*, 1 A. 2d 930 (N. J.); *Hayes v. Hayes*, 115 N. E. 1040 (N. Y.). See also *Browne, Divorce and Alimony* (1890), pp. 16, 296. Other cases are collected in a note, 6 A.L.R.2d 859. \* \* \* In some states it is held that the courts may exercise discretion in modifying or rescinding an award after an absolute divorce, in cases of flagrant

misconduct, such as living with a paramour or in prostitution. *Lindbloom v. Lindbloom*, 230 N. W. 117 (Minn.); *Haritos v. Haritos*, 202 N. W. 181 (Wis.). In a few states the existence of such resources is merely viewed as bearing upon the need for support, not upon the question of liability."

Judge Henderson concluded at 194, 129 A. 2d at 923:

"The question whether an award might be terminated under circumstances shocking to the conscience of the court and outraging public morals may be left open."

In *Atkinson, supra,* we adopted lanaguage which described flagrant misconduct "as living in prostitution, *Courson, supra*; living together as husband and wife when unmarried, *Grant v. Grant*, 126 P. 2d 130 (Cal. 1942); living openly and notoriously with a paramour, *Lindbloom v. Lindbloom*, 180 Minn. 33, 230 N. W. 117 (1930); *Weber v. Weber*, 153 Wis. 132, 140 N. W. 1052 (1913); or gambling or squandering alimony payments, *Daniels v. Daniels*, 351 P. 2d 236 (Idaho, 1960)." [4] 13 Md. App. at 72, 281 A. 2d at 410.

The chancellor's conclusion as to the wife's "propensity toward flagrant misconduct" had no factual basis in any alleged sexual misconduct on her part. Simply and totally it was based on the alleged alcohol problem of the wife. Of the cases cited in *Atkinson* the only one which might lend some support to the chancellor's action in this case is *Daniels v. Daniels*. A close examination of that case however discloses that the language quoted in *Atkinson* is mere dicta and that the Idaho Court reached an opposite conclusion as to the husband's right to a reduction of alimony because of his

---

4. We note *Grant, Lindbloom* and *Weber* were all decided a generation ago. We are not certain, in view of the well publicized sexual revolution of the past 30 years, that similar conclusions as to flagrant misconduct would be reached today.

former wife's alleged adultery. The Court in discussing the status of the parties said:

> "Conceding the general duty she owes society, what right does it give the husband to property justly hers, if she violates that duty? The husband owes a like duty to lead a moral and virtuous life. If he fails to perform it, could it be contended that it would give her a right of additional property, or that there should be an increase in her allowance in consequence? Manifestly not." 351 P. 2d at 239.

We adopt the enlightened view of the Legislature of the State of Maryland which in Maryland Code (1957, 1976 Repl. Vol.) Art. 2C, § 102 (d), states that "[c]hronic alcoholism is an illness that is properly treated under public health, welfare, and rehabilitation procedures." We hold that alcoholism is not such flagrant misconduct as would justify the reduction or suspension of alimony payments. Nor was the chancellor's conclusion that the appellant would spare no effort to squander current and future alimony payments a justifiable basis for denying to her that which the separation agreement entitled her to receive. By analogy, could a court cut off alimony payments because a diabetic spent the funds on the purchase of chocolates? We think not. Of course nothing we have here said would interfere with the chancellor's obligation to consider the circumstances and equities of the case and to subserve the ends of justice and to reach a conclusion which is fair, just and reasonable to the parties. We do not reach the question of the chancellor's power to impose as a condition for the continuation of alimony payments a requirement that a party who is an alcoholic be required to seek treatment.

The appellee suggests that since the original action by the wife sought specific performance of the separation agreement that the chancellor had the discretionary right to refuse specific performance because of the conduct of the wife. *Zouck v. Zouck,* 204 Md. 285, 104 A. 2d 573 (1953). We agree that the discretionary right exists but find nothing in

the record which justifies the conclusion reached by the chancellor. We shall remand. The chancellor, of course, may consider the effect of any change in the circumstances of the parties and may modify the agreement as to the amount of alimony to be paid if he concludes that the facts support such action. *Lott v. Lott*, 17 Md. App. 440, 302 A. 2d 666 (1973).

Simultaneously, with the order suspending current and future payments of alimony, the chancellor suspended the mother's rights of visitation with the minor children. The appellant urges that the chancellor erred in denying her the right to see the children. We are aware that the Court of Appeals in *Radford v. Matczuk*, 223 Md. 483, 164 A. 2d 904 (1960), indicated that a parent's right of visitation is not absolute. In that case at page 488 the Court of Appeals quoting from 2 Nelson, *Divorce*, § 15.26 (2d ed.), stated the general rule to be:

> "A parent whose child is placed in the custody of another person has a right of access to the child at reasonable times. The right of visitation is an important, natural and legal right, although it is not an absolute right, but is one which must yield to the good of the child. A parent's right of access to his or her child will ordinarily be decreed unless the parent has forfeited the privilege by his conduct or unless the exercise of the privilege would injuriously affect the welfare of the child, for it is only in exceptional cases that this right should be denied. And in the absence of extraordinary circumstances, a parent should not be denied the right of visitation, even though the parent has been guilty of marital misconduct. But when it is clearly shown to be best for the welfare of the child, either parent may be denied the right of access to his or her own child."

Visitation rights, however, are not to be denied even to an errant parent unless the best interests of the child would be endangered by such contact. The Court noted that over a

long period of time in a series of cases beginning with *Hill v. Hill*, 49 Md. 450 (1878), and continuing through *Hild v. Hild*, 221 Md. 349, 157 A. 2d 442 (1960), it had never had an occasion to deny the right of visitation to an errant parent. Almost 17 years have passed since the *Radford* case and we find no case either in the Court of Appeals or in this Court where such visitation rights were denied.

Our examination of the record does not convince us that this case is the proper vehicle for such a unique holding. The report of the Department of Social Services does not disclose any information that would indicate that it would be injurious to the children to permit reasonable visitation rights. Exhibits in the case included a report from the doctor at Sheppard and Enoch Pratt Hospital who was treating the younger child and who indicated that visitation by the mother was contraindicated. The social worker at the hospital agreed. It is significant to note that these reports were more than a year old when the case was tried. The only evidence in the case as to visitation with the older child (the daughter now 15 years old) was a statement of the doctor in his report that "I have been told Suzanne had no desire to resume contact with her natural mother." There is nothing in the record to substantiate this hearsay statement, but even if there were such testimony the same ground was one of those suggested for denying visitation rights to the father in *Radford*. The Court in refusing to accept this as a basis for denying visitation said at 223 Md. at 491, 164 A. 2d at 909:

> "The third circumstance in the contention — the desire of the child — even if it has merit, is not controlling. It is true, of course, that the desire of an intelligent child, who has reached the age of discretion, should be given some consideration in determining custody, but even in a custody case the wish is not controlling. *Hild v. Hild, supra; Ross v. Pick*, 199 Md. 341, 86 A. 2d 463 (1952). In this visitation rights case, where the father has asked only that he be allowed to see his son at reasonable

times, and where the child has not seen or known his father nor had an opportunity to make an independent choice based on something more than what had been imparted to him by others, we think the wishes of the child should be given slight, if any, consideration. A choice based on emotions inspired by one parent is no choice at all and need not be honored by a court. Cf. *Casey v. Casey*, 210 Md. 464, 124 A. 2d 254 (1956)."

The reports indicate the only contact by the doctor and social worker was with the father and his second wife. Neither of them ever saw or spoke to the natural mother. Almost two years have passed since these reports were written. We believe the question of visitation rights for the mother will require re-examination by the chancellor in the light of the legal principles we have here enunciated and in the light of a more thorough examination of the present situation of the parties.

We shall remand on the issues of modification of alimony and visitation rights but shall affirm such portion of the decree which directs payment of alimony arrearages and awards custody of the minor children to the father.

*Decree affirmed as to payment of alimony arrearage and as to award of custody of minor children to father.*

*Decree reversed as to suspension of current and future alimony payments; decree reversed as to suspension of visitation rights.*

*Case remanded for further consideration not inconsistent with this opinion.*