# NICHOLAS BOSLEY MERRYMAN KEMP *v.* NANCY C. KEMP

[No. 333, September Term, 1978.]

*Decided April 11, 1979.*

The cause was argued before MOYLAN, LOWE and COUCH, JJ.

*Robert A. DiCicco* and *Beatrice S. Daly* for appellant.

*Donald F. Chiarello* for appellee.

MOYLAN, J., delivered the opinion of the Court.

We are called upon here to decide whether there was sufficient evidence of extraordinary circumstances to warrant a suspension of the appellant's right of visitation with his now 11-year-old son.

The appellant, Nicholas Bosley Merryman Kemp (father), and the appellee, Nancy C. Kemp (mother), were married on December 8, 1961. Two children were born as a result of that marriage — a daughter, Frances Jeffries (Jeff), born December 17, 1962, and a son, Nicholas Bosley Merryman, Jr. (Buzz), born July 20, 1967, the subject of this appeal. Marital problems caused the parties to separate in October, 1972. They were subsequently divorced on May 17, 1974. The divorce decree provided, inter alia, that the mother would have custody of the children and that the father would have reasonable rights of visitation. The decree set out a specific schedule for the father's visitation with his children. The decree further provided that the father was to contribute $50 per week to the support of each child and such other sums as set forth in the property settlement agreement incorporated into the decree. In the agreement, the father, among other things, agreed to pay the reasonable medical and dental expenses of the children and to maintain adequate

medical insurance coverage for them. The agreement provided that he would be consulted on all major medical, surgical and/or dental needs of the children, except where emergency would not so permit.

Apparently, ever since the parties separated, they have argued over the appellant's visitation with Buzz.[1] The arguments reached a head in the summer of 1975 when each party petitioned the court to hold the other in contempt for violations of the divorce decree, and the mother sought to modify the visitation schedule. Before disposition of the various petitions by the court, however, the parties resolved their differences. Even though the child's psychiatrist recommended a suspension of visitation, the parties agreed that the father would see his son for two days every other weekend instead of one day every weekend, as set forth in the divorce decree.

The resolution was short-lived. On April 22, 1977, the mother again filed a petition to modify the father's visitation rights. She alleged that the appellant and his present wife were having domestic problems and that the continued visitation of Buzz with his father under these circumstances and in this environment was not in the child's best interests. Her allegation was based on conversations between her attorney and the appellant's present wife. On May 2, 1977, the court ordered an investigation of the matter by the Probation Department of the Circuit Court for Baltimore County.

Meanwhile, since April 10, 1977, the mother had not allowed the father to visit with his son. On June 27, the father, therefore, filed a petition to hold the mother in contempt of court for failure to comply with the visitation provisions of the divorce decree. He also discontinued sending her support payments for Buzz. As a result, on July 6, the mother filed a cross-petition to hold the father in contempt for failure to pay child support. In her petition, she also stated that Buzz has been under the medical care of a psychiatrist since

---

1. Jeff no longer visits with her father and, as per an agreement between the parties, the appellant is no longer supporting her.

December 30, 1972, and that his father has refused to pay the cost of this psychiatric treatment.

After a full hearing on the petition of April 22, 1977, to modify the father's visitation rights and on the cross-petitions of June 27 and July 6, 1977, to hold each of the parties in contempt, the chancellor issued a memorandum and order finding that the continued visitation of Buzz with his father would not be in the child's best interests. The chancellor also suspended the support payments for Buzz as of the date of the last payment. He found that the conduct of the father was not the sole cause of the estrangement between the father and son and suspended the father's contributions to the support of his son so long as the child refuses to visit with his father. The chancellor dismissed the cross-petitions of June 27 and July 6 to hold each of the parties in contempt but ordered the father to pay the psychiatrist's fee.

The father has filed an appeal from that judgment and the mother has filed a cross-appeal. The father contends that the evidence did not justify a suspension of his right of visitation with his son and that the chancellor erred in ordering him to pay the cost of his son's psychiatric treatment. He further contends that the chancellor erred in failing to hold the appellee in contempt of court for refusing to allow him visitation with his son in accordance with the provisions of the divorce decree. The mother contends that the chancellor erred in suspending support payments for Buzz and in failing to find the father in contempt of court for his arrearages in child support.

The appellant is a general contractor, specializing in excavating. He has operated his own business, on first a part-time and later a full-time basis, since 1949. One month after divorcing the appellee, he married his present wife, Eleanor (Ellie), who is considerably younger than he. The appellant and Ellie have one child, a son, born September 22, 1976, and Ellie has a daughter by a previous marriage, whom the appellant has adopted. The appellant and his current wife reside on the same farm in northern Baltimore County where the appellant and appellee resided when they were married.

The incident which precipitated the appellee's refusal to permit Buzz to visit with his father occurred in April, 1977. The appellee's attorney received a telephone call from the appellant's current wife telling him that she and the appellant were having domestic problems and that she thought it would be advisable that Buzz not visit with them while they were having these problems. She told the attorney that the quarrels had come very close to physical strikings between them and that they were affecting her own two young children. The appellee's attorney wrote to the appellant advising him that Buzz was aware of the problems at the Kemp home and that they had affected him considerably. He advised the appellant that, under the circumstances, the appellee would not permit further visitation.

The appellant explained to the appellee's attorney that he and Ellie merely had an argument over money on April 12. At the hearing, the appellant denied that he and his wife are having serious domestic problems or that they had any violent arguments in Buzz's presence. He testified that on many weekends he consented not to see his son because Buzz would have other activities planned. When the visitation schedule was changed to alternate weekends in November of 1976, Buzz would still have things planned on the weekends he was to visit with him. Sometimes when the appellant went to pick up his son, nobody would be at home. The appellant testified that it would take his son some time to "unwind" when visiting with him but that once he "loosened up," he seemed to enjoy himself. He testified that Buzz gets along well with Ellie and their daughter.

The appellee gave a completely different version of the child's visits with his father. She testified that Buzz has begged her not to make him visit his father and that she, on many occasions, has had to force him to go. She testified that prior to December, 1976, when Buzz was visiting with his father every weekend, he would come home on Sunday nights with severe asthma attacks which required emergency treatment at the hospital and that he experienced severe stomach cramps following the visits which would last for several days, interfering with his school work. The appellee

testified that Buzz's grades at school were very, very poor and that he was very unhappy that he was being forced to visit with his father. Buzz's work would improve the weeks there was no visitation but would slump again after a visit. She testified that Buzz told her that there was a great deal of arguing and fighting at the Kemp home and that he felt uncomfortable there and begged her not to make him go. The appellee testified that since visitation ceased in April, 1977, Buzz has been very, very happy and has had no asthma attacks or stomach cramps.

In questioning by the chancellor, in chambers, out of the presence of the parties, Buzz reaffirmed essentially what his mother had testified—that he did not want to visit with his father. He testified that visits with his father were "no fun" and that there was "nothing to do." He testified that he disliked very much visiting with Ellie and her daughter, "Boo." When the chancellor questioned him whether he wanted his father completely out of his life, he nodded affirmatively. He said that he never wanted to see his father again. He told the chancellor that his father always yells at him and that he feels his father does not love him. Buzz testified that he has been happy that he has not seen his father since Easter, 1977. The chancellor questioned him whether he missed his father, and he shook his head negatively. The chancellor asked Buzz if he would be willing to visit with his father at a place where Ellie was not present, but he insisted that he did not wish to see his father.

The appellee testified that she discontinued Buzz's visits with his father on the advice of the child's psychiatrist, Dr. John M. Arthur. Dr. Arthur testified that he has seen Buzz sporadically over a period of four or five years and sporadically over the course of the last several months. He expressed the opinion that visitation should not be reinstated or continued at this time. He gave as the basis for his opinion:

"Well, I saw Buzz Kemp originally because he was doing very poorly in school, very poorly socially and this could not be accounted for by psychological studies or by his inability and the psychologist referred him to me as a child with personality

problems that he thought was interfering with his functioning. It became clear to me after, I can't say, a number of months that the friction between his parents was a very heavy burden on this boy; he felt this as a very heavy burden. He really suffered from his parents bickering over many issues. One of the issues being, the major one being over him and what he would be doing, where he should spend his time, what he should do.... He had many exciting weekends with his father, actually, at this time and his mother worried about it.... [T]hey would do dramatic things that he thought was very exciting, motorcycle, things that his mother didn't have where they lived in the city and this excited the boy, pleased him and worried his mother, but over a longer period of time it became clear that he was really burdened by the fact that they differed and he was torn in his loyalty between which one he should please, whether he should stay home with his mother or go spend more time with his father. He did poorly, functioned poorly, I think, in general for a bright, perceptive boy. As time went on it became more clear that he was much more comfortable at home with his mother and the exciting things provided by his father simply were no longer exciting and just this past year his schooling has been much improved. He is functioning like a bright boy should function. He is obviously happier, happier than I have ever seen him and I think, too, that this is connected with the approval — with his not being required to go see his father. I think required is the correct word. He considers this a real — he considers it a strain, a burden."

Dr. Arthur felt that forcing Buzz to visit with his father was destructive to the future relationship between them. He testified that Buzz was much happier when he saw him in July of 1977 and that his happiness and his doing better in school were directly related to his feeling that he was not required to see his father.

The chancellor gave great weight to the opinion of Dr. Arthur. He felt that the psychiatrist's opinion was of such "probative force" as to warrant a suspension of visitation privileges.

In *Radford v. Matczuk,* 223 Md. 483, the Court of Appeals quoted the general rule from 2 Nelson, *Divorce,* § 15.26 (2d ed.) that "The right of visitation is an important, natural and legal right, although it is not an absolute right, but is one which must yield to the good of the child." As Nelson further points out, however, a parent should not be denied access to his child in the absence of extraordinary circumstances and only in exceptional cases.

We are not dealing here with an errant parent who has led an immoral or criminal way of life which would adversely affect the welfare of the child. Nor are we dealing with a parent who has been guilty of other grave misconduct such as abandonment of the child, refusal to support, cruelty or neglect. We are simply dealing here with a situation where a child does not wish to visit with his father because he does not like his visitation being the object of controversy in disputes between his parents.

The Court in *Roberts v. Roberts,* 35 Md. App. 497, at 508, pointed out the infrequency with which courts suspend all visitation privileges:

> "[I]n a series of cases beginning with *Hill v. Hill,* 49 Md. 450 (1878), and continuing through *Hild v. Hild,* 221 Md. 349, 157 A. 2d 442 (1960), [the Court of Appeals] had never had an occasion to deny the right of visitation to an errant parent. Almost 17 years have passed since the *Radford* case and we find no case either in the Court of Appeals or in this Court where such visitation rights were denied."

We do not feel that the circumstances here present the exceptional case where all access to the child should be denied the father. The report of the Probation Department to the court made no recommendation that visitation be suspended. Nor was there any clear showing otherwise that any contact of the child with his father would be so detrimental to the

child as seriously to endanger his well-being. It has rather been the squabbling of the parents between themselves over the circumstances of the child's visitation that has been more responsible in the past for the child's unhappiness than the child's contact with his father per se. Dr. Arthur's opinion that visitation should be discontinued was based on the fact that with a cessation in visitation, Buzz is no longer torn in his loyalty between his parents and is much happier. Dr. Arthur testified that the parties constantly bickered over what would occur during Buzz's visits with his father and that Buzz consequently "was torn in his loyalty between which [parent] he should please, whether he should stay home with his mother or go spend more time with his father." We do not feel, however, that such a situation presents the "extraordinary circumstances" which would warrant a complete cessation of visitation privileges, nor do we feel that the estrangement which now exists between the father and son will be mended or reduced by a continued cessation of visitation privileges. If anthing, the lack of visitation will only further alienate the child from his father. The child's wish not to see his father, as expressed at the hearing, has most likely been influenced somewhat by his mother. Although that wish may be taken into consideration, it is not controlling of the visitation question. Absent any other evidence here that visitation would adversely affect the child's welfare, the father's visitation with his son must be reinstated.

We, therefore, reverse the judgment striking out the father's visitation rights with his son and remand the case for the entry of an order allowing the father reasonable visitation privileges. The chancellor may, in the exercise of his discretion, decide the frequency and length of the visits, where those visits are to take place, and whatever details of the visits the chancellor considers reasonable and appropriate.

The appellant's second contention is that the equity court lacked jurisdiction to compel him to pay the cost of Buzz's psychiatric treatment. The chancellor ordered that the appellant reimburse the appellee the $1,245 which she had paid to Dr. Arthur. One of the provisions of the separation

agreement, which was incorporated into the divorce decree, states:

> ". . . The Husband further agrees to pay reasonable medical and dental expenses for said minor children and to maintain in full force and effect adequate Blue Cross-Blue Shield coverage, or similar medical insurance for said minor children. The Husband shall be consulted on all major medical, surgical and/or dental needs for the minor children except where emergency will not permit, provided, however, that Husband shall not unreasonably withhold his consent. . . ."

The appellee counters that since this provision was incorporated into the divorce decree, the equity court retained jurisdiction to enforce its decree.

In *Rand v. Rand,* 13 Md. App. 574, 582, we held that "[a]n equity court has no jurisdiction to compel a father to pay unusual medical expenses in retrospect . . . , or after a decree of divorce has been entered (citations omitted)" but that the remedy is one at law. The Court there quoted at length from *Kriedo v. Kriedo,* 159 Md. 229, at 233:

> "Our conclusion, therefore, is that the father is primarily liable for the extraordinary necessary expenses shown to have been incurred for the benefit of his deceased minor child, which liability is to the persons rendering the service in cases where those rendering service have not been paid, and that the mother is entitled to reimbursement from the father in those cases in which payment has been made by her, but that *upon the refusal of the father to pay, the remedy is by a suit at law wherein he is entitled to have a jury pass upon questions of fact, including the inquiry as to whether the services were rendered, whether they were necessary, and whether the charge was a reasonable and proper one.*" (Emphasis supplied).

The fact that one of the provisions of the separation agreement, which was incorporated into the divorce decree,

provided that the father was to pay "reasonable medical and dental expenses for said minor children" does not alter that holding. The father's primary liability for the medical expenses is to the supplier of the services. It is clear that that liability could only be pursued by the supplier of the services in an action at law and could, in no event, be enforced by the supplier in equity. Even though it is the mother who is seeking to be reimbursed for the cost of the psychiatric treatment, the father is, nevertheless, entitled to have a jury pass upon the same questions of fact — whether the services were necessary and whether the charges were reasonable — as he would be if the supplier of the services brought an action against him. In *Frank v. Frank*, 203 Md. 361, an agreement making a similar provision for medical expenses was incorporated into the divorce decree. The Court, in passing, there noted, at 369:

> "[T]he agreement was modified to provide that the husband should pay all medical expenses incurred or to be incurred because of the mental illness of one child and $16 a week for support of the other, all subject to further order of court. As modified the agreement was incorporated in the decree, which was assented to by the parties. It is quite clear that the order to pay medical expenses was beyond the court's authority, in the absence of agreement. . . . *The husband's liability, to pay for necessaries furnished his minor child, is to the supplier in an action at law, and not enforceable by application of the wife to the divorce court. Kriedo v. Kriedo, supra.*" (Citations omitted) (Emphasis supplied).

We, accordingly, hold that the chancellor lacked jurisdiction to order the appellant to reimburse the appellee for the cost of Buzz's psychiatric treatment.

Each party now asserts that the chancellor abused his discretion in refusing to hold the other in contempt. The mother suspended Buzz's visitation with his father in April, 1977, upon the advice of Dr. Arthur. The appellant

subsequently stopped sending her support payments for Buzz. After she filed her petition to cite him for contempt, he did, however, send several checks for all the arrears directly to Buzz. The appellee refused these checks because they were not made payable to her. On the basis of this evidence, the chancellor refused to hold either party in contempt for violations of the divorce decree.

It is clear that under Courts Art. § 12-304 (a), the right of appeal in contempt cases is not available to the party who unsuccessfully sought to have the other adjudged in contempt. Even assuming, however, that the order "refusing to impose the order for civil contempt is so much a part of or so closely intertwined with [the] judgment or decree which is appealable as to be reviewable on appeal as part of or in connection with the main judgment," as provided in *Tyler v. Baltimore County,* 256 Md. 64, 71 (see also *Becker v. Becker,* 29 Md. App. 339, 345-346), we hold that the chancellor's conclusion not to adjudge either party in contempt was not a clear abuse of his discretion.

There remains for consideration the mother's contention on her cross-appeal that the chancellor erred in suspending support payments for Buzz as of the date of the last payment on May 20, 1977. In cancelling the arrears and suspending future support payments, the chancellor viewed the provisions of the divorce decree providing support payments for Buzz and allowing the father reasonable visitation privileges as being mutually dependent:

> "The evidence proves that the best interest of the son will be served, for this court to order-cessation of visitation rights of the father, and suspension of the support payments, as of the date of the last payment, subject to the continuing jurisdiction of this court.
>
> . . .
>
> "The evidence proves that the conduct of the [father] is not the sole cause of the estrangement between himself and his son. Consequently, in equity and good conscience, the [father's] obligation to

contribute to the support of his son in the future ought to be suspended so long as the son refuses to visit the [father]."

The appellant also viewed his exercise of visitation privileges and his duty to support Buzz as dependent on each other. The chancellor's memorandum states:

"[The father's] counsel argued that it would be better for the child if this court ordered him to visit with his father; that if the visitation is resumed, the father will pay the arrearages in child support and continue to make the regular payments in the future."

The payment of child support and the exercise of visitation privileges as provided in a divorce decree are not mutually dependent. See *Stancill v. Stancill,* 41 Md. App. 335 (1979). The mother's denial of visitation, therefore, is neither an absolute defense to enforcement of arrears in child support payments provided by a divorce decree nor, of itself, grounds for suspending future payments. Of paramount consideration in the equity court's inherent power to modify or cancel arrears in child support or reduce or suspend future payments is always the best interests and welfare of the child. In suspending the payments here, the chancellor considered the equitable circumstances that the mother had been denying the father visitation privileges and that the child did not wish to see his father but did not consider the financial position of the parties and what effect a suspension of support payments to the mother would have on the welfare of the child. In view of the fact that the provisions of the decree regarding child support payments and visitation are not mutually dependent, that the father at no time made any request, formal or informal, that future payments be suspended and, in fact, attempted to send checks for all the arrearages directly to Buzz, and that there was no evidence of the financial position of the parties and whether the mother

could adequately provide for the child, the arrearages should not have been cancelled nor the future payments suspended.

> *Judgment affirmed in part and reversed in part; case remanded for further proceedings in accordance with this opinion; costs to be paid equally by appellant and appellee.*