MARY CATHERINE EGAN DALY, PLAINTIFF, v. GEORGE J. DALY, JR., DEFENDANT.

Juvenile and Domestic Relations Court
Bergen County

Decided January 26, 1956.

*Mr. James S. Ely,* attorney for defendant.

*Mr. Edward G. Evertz,* attorney for County Adjuster's Office.

KOLE, J. J. D. R. C.   This case presents the question of when, if at all, the Uniform Reciprocal Enforcement of Support Act (*N. J. S.* 2A:4–30.1 to 30.23) may be availed of against a father for the support of his children, where he

has always been a resident in New Jersey, and his wife has taken the children from their residence in New Jersey to the state in which the complaint under the act is initiated.

The act vests complete jurisdiction of proceedings thereunder in the Juvenile and Domestic Relations Court. *N. J. S.* 2*A*:4–30.9. The duty of support enforceable thereunder in this State is that "imposed or imposable" by the law of this State, *N. J. S.* 2*A*:4–30.2(*f*); 2*A*:4–30.7; *Coumans v. Albaugh*, 36 *N. J. Super.* 308, 311 (*Juv. Dom. Rel. Ct.* 1955). The remedies under the act are in addition to and not in substitution for any other remedies. *N. J. S.* 2*A*:4:30.3; *State v. Greenberg*, 16 *N. J.* 568 (1954). For an annotation on the act, see 42 *A. L. R.* 2*d* 768 which, among other things, discusses its constitutionality.

It would appear, therefore, that the jurisdiction of this court of cases within the scope of that act is more comprehensive and goes beyond that conferred by the statutory provisions governing direct proceedings in this court (*e. g., N. J. S.* 2*A*:4–18; 2*A*:100–1 and 2). *Cf. State v. Greenberg*, 16 *N. J.* 568, 572 (1954). Thus, in determining a defendant's duty of support in a case properly calling for relief under that act, this court must look to the law of this State relating to the duty of support, whether such duty is imposed by statute or judicial precedent (including decisions of the Court of Chancery and the Superior Court), and is not circumscribed in this respect by other statutory restrictions on its jurisdiction. Accordingly, limitations on the court's jurisdiction in direct proceedings—for example, to order support of a wife where there is a consensual separation (*Caravella v. Caravella*, 36 *N. J. Super.* 447 (*App. Div.* 1955)), or to grant visitation rights as an incident to an order of support (*cf. In re Stevens*, 27 *N. J. Super.* 130; *Id.*, 27 *N. J. Super.* 276 (*App. Div.* 1953)), are inapplicable to proceedings under the Uniform Reciprocal Enforcement of Support Act.

In any event, apart from the question of authority to order visitation rights, this court's jurisdiction to order support of children, even in a direct proceeding, is concurrent

with that of the Superior Court, *N. J. S.* 2A:4–18, *par.* (*b*). Accordingly, resort may properly be had to precedents established as a result of proceedings in that court or its predecessor to determine the extent of a father's duty to support his children imposed or imposable under the law of this State (*N. J. S.* 2A:4–30.2(*f*), 2A:4–30.7).

If the parents and the children were now residents of this State and the children were residing with the plaintiff, defendant would owe the children a duty of support, even though plaintiff had unjustifiably left him and so was not entitled to support for herself. The father's duty to support his children is a continuous one and does not depend on his prosperity or on the existence or non-existence of a duty on his part to support his wife. The court must protect the children, who are innocent pawns in the marital dispute between their parents and without capacity to care for themselves. *Mowery v. Mowery,* 38 *N. J. Super.* 92, 100 (*App. Div.* 1955); *Malkin v. Malkin,* 12 *N. J. Super.* 496 (*App. Div.* 1951); *Rinker v. Rinker,* 3 *N. J. Super.* 251, 256 (*Ch. Div.* 1949); *Danzi v. Danzi,* 142 *N. J. Eq.* 662, 671 (*E. & A.* 1948); *Sermuks v. Sermuks,* 127 *N. J. Eq.* 364 (*E. & A.* 1940). But *cf.* general *dictum* in *Turney v. Nooney,* 21 *N. J. Super.* 522, 526 (*App. Div.* 1952), which appears to be contrary to the principle of the cited cases. The legal and natural duty of a father to support his children is not to be evaded by him on the ground of dissensions with his wife. A natural father would not think of doing so, and an unnatural father should not be permitted to do so. 17 *Am. Jur. Divorce and Separation, sec.* 693, *p.* 529.

And the foregoing duty of support of children on the part of a father exists under the laws of this State even where the children reside outside of the State, provided, of course, the father is subject to the jurisdiction of the New Jersey courts. *Conwell v. Conwell,* 3 *N. J.* 266, 273 (1949).

In short, the welfare of the children is the touchstone in matters of support, just as it is in matters of custody (*cf. Lippincott v. Lippincott,* 97 *N. J. Eq.* 517 (*E. & A.* 1925); *Sheehan v. Sheehan,* 38 *N. J. Super.* 120, 125 (*App.*

*Div.* 1955)), whether the children are residents or non-residents of this State.

■ Thus, the general rule is that the father's duty of support and his rights of visitation with the children to be supported are not inter-dependent. *Bruguier v. Bruguier,* 12 *N. J. Super.* 350, 354 (*Ch. Div.* 1951); 67 *C. J. S., Parent and Child,* § 15, *p.* 695; *Berkley v. Berkley,* 246 *S. W. 2d* 804, 34 *A. L. R. 2d* 1456 (*Mo. Sup. Ct.* 1952); *In re Dubin,* 201 *Misc.* 621, 112 *N. Y. S. 2d* 267, 272 (*Dom. Rel. Ct. N. Y.* 1952); *Almandares v. Almandares,* 186 *Misc.* 667, 60 *N. Y. S. 2d* 164 (*Dom. Rel. Ct. N. Y.* 1946); *Broemmer v. Broemmer,* 219 *S. W. 2d* 300 (*Mo. Ct. App.* 1949).

■ But there are exceptions to this general rule in situations where the welfare of the children requires that they be afforded the privilege of getting to know, love, and respect both parents. The "court should strain every effort to attain for the child the affection of both parents rather than one * * * 'the greatest benefit a court can bestow upon children * * * is in insuring that the children shall not only retain the love of both parents, but shall be at all times * * * imbued with love and respect for both parents.'" *Turney v. Nooney,* 5 *N. J. Super.* 392, 397 (*App. Div.* 1949). To the same effect *Thurman v. Thurman,* 73 *Idaho* 122, 245 *P. 2d* 810, 32 *A. L. R. 2d* 996 (*Sup. Ct.* 1952). Where the children are in the custody of one parent, the reasonable right of visitation conferred on the other parent is a method by which the law endeavors to effect this facet of the children's welfare. *Bierck v. Bierck,* 123 *A.* 537 (*N. J. Ch.* 1923), not officially reported; *Turney v. Nooney,* 5 *N. J. Super.* 392, 397 (*App. Div.* 1949); *In re Jackson,* 13 *N. J. Super.* 144, 145, 147 (*App. Div.* 1951).

■ The policy of the law of this State against the thwarting of effective visitation rights is evident from our statutes which, generally, prohibit one parent from removing the children from this State and restrain the awarding of custody to a parent who will take the children to another state, except where the welfare of the children dictates

otherwise. *N. J. R. S.* 9:2–2, 9:2–3, 9:2–4. (And see *N. J. R. S.* 9:2–6, which protects the father's visitation rights even where by law he is not entitled to custody for failure to support for the statutory period). *Sheehan v. Sheehan,* 38 *N. J. Super.* 120, 126 (*App. Div.* 1955), and cases cited therein; *Hubschman v. Hubschman,* 24 *N. J. Misc.* 189, 197 (*Ch.* 1946), affirmed 140 *N. J. Eq.* 284 (*E. & A.* 1947).

One of the devices used by the courts to give effectiveness to a father's visitation rights, where the children have been taken out of the State by the mother to a place so distant as in effect to destroy such rights, is to reduce, discontinue or suspend an existing order for the support of the children until the children are returned or until in some other fashion the father's visitation rights can be fully protected. See *Feinberg v. Feinberg,* 72 *N. J. Eq.* 810 (*Ch.* 1907); *Von Bernuth v. Von Bernuth,* 76 *N. J. Eq.* 200 (*Ch.* 1909); *Bobinski v. Bobinski,* 285 *App. Div.* 836, 137 *N. Y. S. 2d* 432 (*App. Div.* 1955); *Beddini v. Beddini,* 281 *App. Div.* 701, 117 *N. Y. S. 2d* 511 (*App. Div.* 1952); *In re Schwartz,* 279 *App. Div.* 1090, 113 *N. Y. S. 2d* 455 (*App. Div.* 1952); *Goldner v. Goldner,* 284 *App. Div.* 961, 135 *N. Y. S. 2d* 337 (*App. Div.* 1954).

In *Feinberg v. Feinberg, supra,* on an application by a father to be relieved of the duty of support for a child who had been removed from New Jersey to Pittsburgh by his wife, Vice-Chancellor Leaming ordered a hearing to determine whether future support payments should be discontinued until the child should be returned to New Jersey or to a place (such as Philadelphia) where the father's visitation rights could be fully protected. He stated:

"It is manifest that * * * it would be destructive of the right of visitation to make an order permitting custody of the minor to be maintained in Pittsburgh, but it is not clear that circumstances may not demand an order for such privilege in Philadelphia."

In *Von Bernuth v. Von Bernuth, supra,* Vice Chancellor Howell denied a father's petition for custody and visitation rights because the children refused to go with him and

exhibited a hatred towards him instilled by their mother. However, he reduced the amount of support for the children from $46 to $10 per week, saying:

"I see no reason why the father should be compelled to support children who thus renounce him."

Thus, where the long-range welfare of the children requires that they have reasonable visitation with their father, the courts have not been loath to bring pressure on the mother to make such visitation rights effective, by using the economic sanction of temporarily depriving her of support for the children or reducing such support.

The foregoing represents the principles which, it would appear, would govern the Superior Court if plaintiff had instituted a direct proceeding against defendant in that court for support of her children. That court could then deal fully with all aspects of the case, including custody and visitation rights. The same principles would govern this court if plaintiff had instituted a direct proceeding against defendant here for such support, except that this court could not decide questions of custody or visitation rights. However, in determining the extent of defendant's duty of support, this court could take into account the difficulties and expense which defendant would have to undergo in effecting such visitation with the children as their welfare may require.

Is defendant's duty of support or the extent thereof any different because the proceedings are instituted under the Uniform Reciprocal Enforcement of Support Act; or must plaintiff come to this State and institute a direct proceeding in this court or in the Superior Court to obtain the fore-going relief?

It has been said that the purpose of the Uniform Reciprocal Enforcement of Support Act is to provide an inexpensive procedure for obtaining support from a husband or father who has left his wife or children in another state and is not supporting them adequately. The act obviates the difficulty and expense of travel to this State by a wife or children residing in another state to litigate their right to support against a

husband or father present in this State. It provides a remedy additional to and not in substitution for direct proceedings for support of dependents in the courts of this State permitted by other statutes. It has been stated that both the Reciprocal Act and the statutes permitting such direct proceedings where plaintiff and her children are non-residents, are facets of the same public policy of preventing this State from becoming a haven for husbands or fathers who endeavor to escape their responsibilities for support by crossing state lines. *State v. Greenberg*, 16 *N. J.* 568, 572 (1954) ; *Woodhouse v. Woodhouse*, 17 *N. J.* 409, 415, 417, 418 (1955).

But, although the purpose of the act appears to be to afford an inexpensive remedy against an absconding husband who has left his family in another state, the statutory provisions themselves are not so restricted and are not limited to proceedings against an absconding husband or father who has fled from one state to the responding state—*i. e.*, this State. The courts of two other states—California and North Carolina—have so interpreted this Uniform Act. *Smith v. Smith*, 131 *Cal. App.* 2d 764, 281 *P.* 2d 274, 278 (*Ct. App.* 1955) ; *Mahan v. Read*, 240 *N. C.* 641, 83 *S. E.* 2d 706, 712 (*Sup. Ct.* 1954). Since this construction of the act appears to be proper, it will be adopted by this court. *N. J. S.* 2*A* :4–30.1.

Thus, all that is required for jurisdiction in this court of a proceeding under the provisions of the Reciprocal Act is the "presence" of the husband or father (obligor) in this State, the presence or residence of the children or the wife (obligee) in another state, and the existence of a duty of support on the part of the father under the laws of this State. *N. J. S.* 2*A* :4–30.4, 2*A* :4–30.7. The use of the word "presence" in the statute avoids the necessity of the ofttimes difficult question of determining whether the wife or children have acquired a domicile in the initiating state separate and apart from the husband. *Cf. Gonzalez-Fantony v. Fantony*, 31 *N. J. Super.* 14, 19 (*App. Div.* 1954) ; *Zieper v. Zieper*, 14 *N. J.* 551 (1954) ; *Shepherd v. Ward*,

5 *N. J.* 92 (1950). Their presence there is sufficient for jurisdiction under the Reciprocal Act.

As the California court said in *Smith v. Smith,* 131 *Cal. App. 2d* 764, 281 *P. 2d* 274, 278:

"It is next contended that the Uniform Reciprocal Enforcement Acts are not applicable  *  *  *  for the reason that the appellant did not flee from the state of Colorado to avoid any duty of support  *  *  *  that [his] sojourn in Colorado was intended to be temporary; that it is the respondent [wife]  *  *  *  who is in the role of a deserter or fugitive, that these  *  *  *  Acts were intended to apply only to deserting fathers who fled from the state; and that these Acts are not broad enough to apply to cases where the obligee deserts the obligor without just cause. The Acts in question are not limited to cases where an obligor flees the jurisdiction of an initiating state. They are based upon the failure to provide needed support for dependents, and the flight of the obligor is in no way made the controlling fact."

And in *Mahan v. Read,* 240 *N. C.* 641, 83 *S. E. 2d* 706, 712, until 1951 the father, mother and children resided in North Carolina. The plaintiff mother then left the defendant father in North Carolina and took the children with her to Arkansas where she obtained a divorce and remarried. In 1953 she filed a proceeding under the Arkansas Reciprocal Act for support of the children but before it reached the North Carolina court she had moved from Arkansas and was in Virginia at the time the North Carolina court was ready to act. The North Carolina Supreme Court refused to entertain the Arkansas proceedings because of the confusion which would result by reason of the plaintiff's now being a Virginia resident. However, it suggested that the interests of the children, as long as they remained in Virginia, could be protected by a Virginia-North Carolina proceeding under the uniform acts of both states.

The question, then, is not one of jurisdiction. It is rather a question of statutory interpretation to determine the circumstances under which this court should exercise its jurisdiction under the Reciprocal Act. This question, of necessity, must be decided on a case-to-case basis.

In determining whether the act should be applied to, and jurisdiction exercised in, a given case, the court should

consider the basic policy as well as the words of the act. A construction should be adopted which will advance the policy and true sense of the statute. "The reason of the statute prevails over the literal sense of terms; the obvious policy is an implied limitation on the sense of general terms, and a touchstone for the expansion of narrower terms." *Fischer v. Fischer,* 13 *N. J.* 162, 168 (1953).

In construing the act the court must also be mindful of the injunction that every "endeavor should be made by the courts to render this statute operable, for the objectives of the legislation are very worthy." *Pfueller v. Pfueller,* 37 *N. J. Super.* 106 (*App. Div.* 1955). It must also consider the fact that the proceedings under the Reciprocal Act are not as perfect as a direct proceeding, in the sense that the court ultimately deciding the question of the duty of support usually does not have the opportunity to observe and hear the wife as she testifies and the defendant, except where he is willing and able financially to attend the taking of depositions in the initiating state, does not have the same opportunity to cross-examine the plaintiff as in a direct proceeding in the courts of this State.

The foregoing considerations lead to the conclusion that jurisdiction under the Reciprocal Act should be exercised in the following situation: Where the wife has a *bona fide* reason for removing the children from New Jersey to the foreign state, which reason is consistent with the children's welfare, and the children are in need of support from the father, the wife may use the Reciprocal Act to obtain relief against their father here for their support. *Cf. Smith v. Smith,* 131 *Cal. App.* 2d 764, 281 *P.* 2d 274 (*D. Ct. App.* 1955); *Mahan v. Read,* 240 *N. C.* 641, 83 *S. E.* 2d 706 (*Sup. Ct.* 1954); *Broemmer v. Broemmer,* 219 *S. W.* 2d 300 (*Mo. Ct. App.* 1949); *Almandares v. Almandares,* 186 *Misc.* 667, 60 *N. Y. S.* 2d 164 (*Dom. Rel. Ct. N. Y.* 1946). And, as stated earlier, this court has authority, where the welfare of the children so require, in such a case, to incorporate in the support order adequate provision for visitation rights by the father and to use the sanction of temporary

deprivation or reduction of such support as a means of making such visitation rights effective.

On the other hand, the same considerations lead to the conclusion that jurisdiction under the Reciprocal Act should not be exercised in the following situation: Where the father is at all times willing to support the children in this State; his wife leaves the State with the children for the purpose of (1) obtaining a foreign divorce on grounds probably not adequate for a divorce here, and (2) of using the Reciprocal Act to obtain support of the children, and to avoid the necessity of appearing in a New Jersey court; and there is no showing that the welfare of the children is being served by keeping them in the foreign state at a distance from the father, or that the children are in need of support from the father,—in these circumstances, this court should not permit the wife to entertain proceedings for support of the children under the Reciprocal Act. In such a situation the wife should be required to seek relief in a direct proceeding in the courts of this State for such support, in which the rights of both parties and the children can be adequately determined and protected. *Cf. Turney v. Nooney*, 21 *N. J. Super.* 522, 526 (*App. Div.* 1952); 8 *Rutgers L. Rev.* 207; *N. J. S.* 2A:34-22.

Since the case at bar is one which should be entertained by this court under the Reciprocal Act in accordance with the foregoing construction of the act, there is no occasion at this time to endeavor to determine when, if at all, that act may be availed of in situations falling between the facts set forth in the preceding paragraph and those in the instant case. Each case must be decided on its own facts.

The facts of the case at bar, established by the verified complaints and depositions of plaintiff and by the testimony adduced by defendant (stenographically taken and transcribed) at the hearings held on September 30, 1955, November 15, 1955, and December 13, 1955, are as follows:

Plaintiff wife was a resident of Kentucky prior to her marriage to defendant. She married defendant July 27, 1945, and until about June 13, 1951 she resided with him

and their children at Rutherford, Bergen County, New Jersey, in a house owned by plaintiff and defendant jointly. The children are two girls, now age nine and seven, and two boys, now age six and four. On or about June 13, 1951 plaintiff left defendant and took the children with her to Kentucky where she and her children have resided ever since in the town where her folks are.

Notwithstanding the fact that she then resided in Kentucky, plaintiff, through her attorney, Joseph Winberry, initiated a direct proceeding for support of the children by complaint in this court, filed June 25, 1951. In that verified complaint she stated that she was forced to leave with the children because of defendant's violent abuse when he was intoxicated; that she and the children were greatly in fear of him; that he provided food while they lived together, but no clothing; that he squandered his money on liquor, and milk and other bills were overdue; and that he had failed to provide for the children since they left New Jersey. Her deposition, taken in the present proceedings on October 21, 1955, more than four years later, fully supports the charges in that complaint. She testified that defendant's excessive drinking, his belligerent conduct while drunk, his refusal to help himself by declining assistance (which plaintiff had arranged) from Alcoholics Anonymous or the parish priest, his refusal to follow the family doctor's order that, since he was an alcoholic, he should stop drinking, and his being so drunk in front of the children that plaintiff was fearful of leaving the children alone with him—all of these factors led to her returning with the children to her folks in Kentucky. She testified, further, that during the three months before she left, he slept in the car one night, since he was unable to navigate from it to the house; and about three nights per week he slept on the living room floor or any place he would happen to land. Defendant admitted at the hearing that his wife asked him to go to Alcoholics Anonymous and to the family doctor, and that the latter ordered him to stop drinking. Nor did he categorically deny that he drank to excess. His testimony in this regard was very evasive;

he attempted to hedge his answers and was more concerned with arriving at a definition of "drunk" than with the issue of whether he was one who drank to excess. He admitted he liked his beer, and he and his wife often argued about his drinking. I agree with plaintiff that, when she left in June 1951 in view of defendant's behavior, the home in Rutherford was not a proper place to rear four children. I find, therefore, that the welfare of the children required, in June 1951, that they be taken out of the defendant's home, and that, since plaintiff's folks lived in Kentucky, her taking them there was then in the best interests of the children.

I am not unmindful of the fact that the Prudential Insurance Company, for whom defendant worked until his employment was terminated, gave him an honorable service certificate in February 1951. But that certificate in no way affects the credibility of plaintiff's testimony as to defendant's behavior at home and towards the children. Nor is the fact that, when she departed in June 1951, plaintiff left a note stating that she was visiting her ailing mother, of such persuasive force as to lead to a different conclusion as to her real reason for leaving.

On July 19, 1951 plaintiff returned to New Jersey for a hearing on the complaint filed a month earlier. But no hearing took place. Instead, she, defendant, her attorney Joseph Winberry, and defendant's attorney James Ely, held a conference about the matter of support.

According to plaintiff's attorney, Joseph Winberry, who was called as *defendant's* witness in this proceeding, the parties discussed a possible consent judgment for support of the children. They could not agree. Plaintiff became upset. All she wanted was some assurance that defendant would pay for the support of the children. She did not desire to proceed with the complaint because she did not wish to embarrass her husband and his brother, who was an attorney. Accordingly, when they could not agree she returned to Kentucky, and the matter was adjourned to October 1951. Defendant claims that during that conference he offered to

give plaintiff $45 per week and to pay rent and doctor and dentist bills, as support for the children, if she would return to New Jersey with the children and live with his mother until they could straighten out their marital problems. He stated that she agreed to do this, and that he gave her attorney $45 for the first week's support which, incidentally, she never received. But plaintiff denies any such agreement and testified that she had no funds with which to bring the children back to New Jersey. Defendant admitted that he did not then give her any money to pay for returning the children to this State. I find that the alleged agreement was not made by the plaintiff, and that even if there were such an agreement, defendant's offer of support was not then made in good faith, since he did not even provide his wife with the money required to effect a return to New Jersey. Indeed, as admitted by defendant's attorney during the December 13, 1955 hearing, the only purpose in his making the alleged agreement of support was that the defendant knew she would not come back to New Jersey. Indicative of defendant's attitude and lack of parental concern for the welfare of his children is the fact that not once, since July 1951, has he sent or endeavored to send any money for their support.

On October 2, 1951 plaintiff's attorney informed the court that plaintiff no longer desired to press the complaint then pending, and the proceedings therein were discontinued.

Thereafter, in 1951, defendant went to Kentucky, apparently to induce his wife to return with the children to New Jersey. Plaintiff testified that while he was in Kentucky defendant was a patient at the hospital there for delirium tremens; that after he was released he was very belligerent, and that she finally had to ask him to return to his mother to get straightened out. Defendant admits going to the hospital for his nerves, but denies that it was for delirium tremens. He claims that plaintiff would not permit him to take the children out of the house, since she was nervous about them, and when she refused to let him see them at all he returned to New Jersey. I find that defendant had continued his drinking excesses while in Kentucky, and had

not behaved in such fashion as would then warrant his wife's return here with the children or his free visitation in Kentucky with the children.

Defendant then returned to Rutherford. He sold the jointly-owned house and sent plaintiff $3,200, representing one-half of the proceeds. He was, of course, only giving her what she was legally entitled to, particularly since she, a veteran, had used her V. A. loan rights when the property was purchased.

Defendant testified that thereafter plaintiff never requested support for the children. Of course, that fact, even if true, would not preclude her obtaining such support now. But plaintiff testified otherwise. She asked him, she said, for money over the telephone, but his answer was that "they are your children and you take care of them." In any event, defendant's inaction speaks louder than his words. The fact is that he did not send any money for the support of the children or offer to do so since July 19, 1951.

Plaintiff was financially unable to file a further direct proceeding in New Jersey, since she could not afford to come here for that purpose. After she learned of the existence of the Reciprocal Act she filed a complaint in August 1955 under the Kentucky Reciprocal Act, which was sent to this court for disposition under the New Jersey Reciprocal Act. It is this complaint which gave rise to the present proceedings. Attached to this complaint is a pauper's affidavit executed by plaintiff, to the effect that because of her impoverished condition she is unable to pay the costs of the action.

The first hearing on this complaint was held on September 30, 1955. Defendant testified fully. I then asked his counsel whether he desired to propound written interrogatories to plaintiff or to take her depositions. He refused to do so, but indicated that he would have no objection if it were done by some one else.

I thereupon adjourned the hearing and sent a certified copy of the transcript of defendant's testimony of September 30, 1955, to the initiating court in Kentucky and

requested that plaintiff testify as to the matters there raised. Pursuant to its practice, the Kentucky court had plaintiff's sworn and signed depositions taken on the issues so raised and sent them to this court for further action. On October 26, 1955 this court notified defendant's attorney of the receipt of the depositions and that he would be permitted to read them. A further hearing was held on November 15, 1955, at which time defendant's attorney objected to the use of the depositions and of two letters attached thereto. I struck the letters from the record. I agreed with defendant that under our rules he should have been given notice of the taking of the depositions (*Pfueller v. Pfueller, supra*) so as to have full opportunity to cross-examine plaintiff. Accordingly, I asked defendant's attorney whether he would be willing to go to Kentucky to cross-examine the plaintiff, and indicated a willingness to do anything within reason that defendant felt was required for a fair hearing. Defendant's attorney stated that he wanted an opportunity to discuss with his client whether he should go to Kentucky to cross-examine plaintiff or should use interrogatories. I thereupon gave defendant's attorney a copy of the plaintiff's depositions and adjourned the matter for two weeks (later further adjourned to December 13, 1955) to give defendant an opportunity to decide what course of action he desired to take in connection with the depositions.

At the adjourned hearing, which was held December 13, 1955, defendant requested neither an opportunity to cross-examine in Kentucky nor to submit written interrogatories, but instead, proceeded with taking further testimony from plaintiff's former attorney, Mr. Winberry, and the defendant. Under these circumstances, defendant has plainly waived his right to object to the use of plaintiff's depositions because of his not having been notified of the taking of the depositions, and has also waived his right to cross-examine plaintiff. *Smith v. Smith,* 125 *Cal. App. 2d* 154, 270 *P. 2d* 613, 623 (*D. Ct. App.* 1954). *Cf. Malkin v. Malkin,* 12 *N. J. Super.* 496, 499 (*App. Div.* 1951); *Rufner v. Rufner,* 131 *N. J. Eq.* 193 (*E. & A.* 1942); *Ross v. Ross,* 35 *N. J. Super.*

242, 250–252 (*Ch.* 1955); *Barber v. Vaccaro,* 32 *N. J. Super.* 573, 579–580 (*App. Div.* 1954). He was certainly afforded every right he would have had, had he been duly notified of the taking of the depositions. He cannot, therefore, now claim any prejudice by the use of such depositions in these proceedings.

At none of the hearings was there any evidence adduced which would tend in any wise to show that the retention of custody of the children by the mother was contrary to their best interests.

At the December 13 hearing the court asked defendant whether he would be willing to pay for the expense of having the children make periodic visits to New Jersey to see him, if that could be arranged. The defendant most emphatically indicated his willingness to do so, and his attorney stated that there would be no case at all if defendant could have the children for reasonable periods. Defendant stated that he would not want to break up the children's school year; he said he wanted them in New Jersey merely during the summer months and wanted the right to see them in Kentucky at other times. But he balked at a consent order of support conditioned on such visitation rights, since he was then unemployed and was home taking care of his aged and sick parents.

After the end of the December 13 hearing I found that defendant was under a duty to support his children enforceable under the Reciprocal Act. I found, further, that an able-bodied and well man such as he had no justification whatsoever for being unemployed when he has four children to support. *Mowery v. Mowery,* 38 *N. J. Super.* 92 (*App. Div.* 1955). The fact that he is taking care of his parents is commendable but does not excuse his failure to work and earn sufficient to support his own children.

Plaintiff proved that she needed a total of $40 per week for the four children. Defendant offered no evidence to controvert the need for such amount, except to testify that plaintiff may work as a registered nurse. After considering all of the factors required to determine the amount to be

ordered for the support of children (*Mowery v. Mowery, supra*) including, among other things, defendant's potential earning capacity were he to apply himself to work, the needs of the children and the expense defendant would be required to undergo to effectuate his visitation rights hereinafter discussed, I found that an order of $32 per week for the support of the four children, or $8 per week per child, was proper.

Mindful of the policy of the law to promote mutual love and respect between parent and child by permitting liberal visitation rights, and since it appeared that defendant may have changed his ways, that his expressed desire to visit with his growing children was genuine, and that their welfare might be advanced by presently permitting such rights, the court also incorporated in the order of support, entered December 14, 1955, a provision as to visitation, which, as hereinbefore stated, it has authority to order. The support order is, therefore, conditioned on plaintiff's permitting defendant reasonable visitation rights with the children at their present place of residence in Kentucky, and permitting him to have the children with him for at least one month during July and August of each year, such month to be selected by plaintiff. The order further provides that defendant shall pay for the travel expenses of the children from and to Kentucky and, while they are with him in New Jersey, the support provisions of the order shall be suspended. The order contemplates that the support provisions shall be in effect immediately and, although those provisions are conditioned on plaintiff's compliance with the visitation provisions, the support order will not in any way be suspended or terminated (except for a suspension while the children are with defendant), save upon application by defendant. The support order entered in this case, therefore, does not have the automatic termination infirmity found in *Lawton v. Lawton*, 140 *N. J. Eq.* 16 (*E. & A.* 1947).

Even if this court does not have the authority to order visitation rights, the support provisions of the order will nevertheless stand. In that event, as to defendant, the visitation provisions, to which he consented, will be mere surplusage.