184 N.J. Super. 297 (1982)
445 A.2d 1182
DEANNA BARRON, PLAINTIFF,
v.
JAMES JOSEPH BARRON, DEFENDANT.
Superior Court of New Jersey, Chancery Division Somerset County.
Decided April 1, 1982.
*298 Robert S. Johnson, for plaintiff.
Don Shur, for defendant.
IMBRIANI, J.S.C.
Are visitation rights of a noncustodial parent forfeited if not exercised for five years? Can visitation rights ever be abandoned? While our adoption laws permit the termination of parental rights where there has been intentional abandonment or substantial neglect by such parent, see N.J.S.A. 9:3-48(c), no case in New Jersey has ever terminated visitation rights simply because a parent has abandoned or neglected a child. Indeed, "[a]bsent serious wrong doing or unfitness, the right of visitation is strong and compelling." In re J.J.P.'s Adoption, 175 N.J. Super. 420, 430 (App.Div. 1980).
*299 The parties were married on October 12, 1970 and had two children, now ages 13 and 9 years. They initially separated in late 1973, resumed cohabitation for a short period and separated again in late 1974. Except for a three-month period in 1975 (when the children were placed in a foster home), the children always resided with their mother. The parties were divorced in 1975 and both remarried. The father did not see or support his children from the last separation in 1974 until 1979, when he sought and was refused visitation. He voluntarily withheld his request for visitation until the outcome of these proceedings. Thus, he last saw his children seven years ago, when they were six and two years old.
The father testified that between 1974 and 1979 he desired to see his children but he was unable to locate them. He said he made innumerable telephone calls to his mother-in-law seeking to locate his children, but she steadfastly refused to assist him and, indeed, did everything possible to discourage him from wanting to see the children. He offered no evidence, such as telephone bills, to confirm that such calls were made. His mother-in-law denied receiving any telephone calls.
While the parties were living together they resided in Piscataway, New Jersey. During the five-year absence (1974 to 1979) the wife continued to reside there and in the adjoining communities of Bound Brook or Middlesex. He resided initially in the Asbury Park area, then for two years with his parents in Massachusetts (the wife testified she met her in-laws twice and did not know where they lived or how to contact them), and finally in the Atlantic City area where he now resides.
The wife believes that he did not attempt to locate his children between 1974 and 1979, and argues that any father who fails without adequate reason to see and support his children for five years has abandoned them and should be forever denied visitation rights. She insists that it would be psychologically and emotionally harmful to the children to permit visitation at this time, and asserts that the children do not want to see their *300 father (which the children confirmed during an in camera interview with the court), have treated her new husband as their father and, as a result of this dispute, have become confused and upset, causing them to suffer headaches, upset stomaches, and extreme anxiety.
The father acknowledges that the children do not wish to see him and probably are fearful of resuming contact with him. But he insists that their attitudes have been influenced by their mother, either by commission or omission.
Courts have long exercised the power to resolve visitation disputes. The court in Baker v. Baker, 81 N.J. Eq. 135 (Ch. 1912), said:
Where the parents are living separately either has a right to see any child which is in the custody of the other, and if the parties cannot agree the court will make such order in the premises as seems best under all the circumstances. [At 136]
Several reasons have been expressed for allowing visitation. Baker emphasized the desirability of permitting the noncustodial parent to ascertain if support payments are being properly administered, i.e., whether the children are being properly fed, housed and clothed and if care is being taken to assure that they are receiving the best possible education and moral training. Id. at 137. A second reason was ennunciated in Daly v. Daly, 39 N.J. Super. 117 (Cty.Ct. 1956) (frequently cited for the proposition that a parent's duty to pay child support and the right of visitation are not interdependent):
... [T]he welfare of the children requires that they be afforded the privilege of getting to know, love and respect both parents. The "court should strain every effort to attain for the child the affection of both parents rather than one * * * `the greatest benefit a court can bestow upon children * * * is in insuring that the children shall not only retain the love of both parents, but shall be at all times * * * imbued with love and respect for both parents'." [citations omitted] Where the children are in the custody of one parent, the reasonable right of visitation conferred on the other parent is a method by which the law endeavors to effect this facet of the children's welfare. [At 123]
Parental rights have always occupied an exalted position in our society. And since visitation rights are a diminishment of parental rights previously enjoyed, they naturally take on special importance to the noncustodial parent. Such rights are *301 preserved by N.J.S.A. 9:2-4, which says, albeit with respect to custody, that "the rights of both parents, in the absence of misconduct, shall be held to be equal," and the U.S. Constitution which provides that the right "to raise one's children [is an] `essential' ... `basic civil right ... of man' ... and ... far more precious ... than property rights." Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). There can be little doubt that whoever seeks to diminish these rights carries a heavy burden of persuasion. Parental rights will be preserved unless enforcing them will adversely affect the "safety, happiness, physical, mental and moral welfare of the child." Fantony v. Fantony, 21 N.J. 525, 536 (1956).
This father exerted, at best, minimal efforts to locate and visit with his children through the five year absence. And during this period he did not support them. For this he is certainly subject to censure. But our purpose is not to punish him. Rather it is to build and secure for these children a happy and peaceful future. While we can criticize the father for his past conduct, he apparently has now adopted a more wholesome and responsible attitude toward his children. He is older and more mature. And since there is no evidence that the father will endanger the children, either physically or emotionally, or that he is an unfit parent, who can say that these children will not benefit from the love, affection and companionship which he is now willing and able to give them? Admittedly, this will not occur immediately. But as with so many matters pertaining to human affairs, time heals many wounds.
As recently noted by In re Mercado Adoption, 182 N.J. Super. 628 (App.Div. 1982), which reversed and remanded a trial court decision that granted an adoption to a stepfather because of the "willful" failure of the natural father to exercise his parental obligations, and that such failure was likely to continue in the future:
... a past history of non-support and parental neglect may be subject to reform and rehabilitation. In re Adoption of Children by D., 61 N.J. [89] at 98. The very fact the natural father has seen fit to prosecute on appeal from the *302 judgment terminating his parental rights suggests the potential of such a future course of conduct and should be carefully considered by the trial judge. [At 631]
Other jurisdictions have rejected the theory of abandonment when a parent was absent for a long time. In Radford v. Matczuk, 223 Md. 483, 164 A.2d 904 (App. 1960) the father did not see or support his son for ten years, was convicted of stealing government property, served eight months in jail, and received a dishonorable discharge from the Armed Services. The father and his relatives (who assisted him in caring for the children) were found to be "friendly, pleasant and interested persons.... There was nothing in the record to indicate that the natural father had continued either an immoral or criminal way of life". Id. 164 A.2d at 906-907. The court said that while the custodial parent will understandably have misgivings of the results that visitation may engender, a long delay in seeking visitation does not constitute abandonment and, even if it did, "abandonment is not a bar to the right of visitation." Id. at 909.
A similar result was reached in Aud v. Etienne, 47 Ill.2d 110, 264 N.E.2d 196 (Sup.Ct. 1970), which held that, while the absence of a mother for six years may subject her to censure, the drastic punishment of denying her visitation should be avoided even though a recent renewal of visitation resulted in the children becoming "emotionally upset". Id. 264 N.E.2d at 197. The court noted that the children's reaction is often a reflection of the animosity of the custodial parent and the understandable loyalty of the child to the custodial parent.
In Wilson v. Wilson, 73 Idaho 326, 252 P.2d 197 (Sup.Ct. 1953), visitation was granted to a father in spite of a five-year absence because there was no showing that it would be detrimental to the welfare of the child. And a long line of Pennsylvania cases reached a similar result, commencing with Commonwealth ex rel. Boschert v. Cook, 122 Pa.Super. 397, 186 A. 229 (Sup.Ct. 1936), which held that neglect or abandonment of a child for nine or ten years does not justify denial of visitation rights. One case, Commonwealth ex rel. Turner v. Strange, 179 Pa.Super. 83, 115 A.2d 885 (Super.Ct. 1955), said that the principle of *303 "abandonment" has no relevancy in a visitation case because "[i]t is not the law that a parent who abandons her children loses thereby the right of visitation". (115 A.2d at 886).
This court rejects the theory that visitation rights can be abandoned. However, visitation may be denied a non-custodial parent if it is in the best interest of the children to do so. But the denial of visitation rights is such an extraordinary proscription that it should be invoked only in those exceptional cases where it clearly and convincingly appears that the granting of visitation will cause physical or emotional harm to the children or where it is demonstrated that the parent is unfit. There was no such proof in this case. Even though the bond between parent and child may now be weak and fragile, and perhaps even ruptured, we should do everything in our power to repair and strengthen that bond, rather than sever it.
While it is true that "intentional abandonment or very substantial neglect of parental duties without a reasonable expectation of reversal of that conduct in the future," see N.J.S.A. 9:3-48(c), will result in the complete loss of all parental rights in adoption proceedings, those proceedings can be distinguished. There we are concerned not simply with the termination of a portion of the parent-child relationship but also, more importantly, with the creation of a new and genuine parent-child relationship with someone else. Here the wife seeks only to destroy a relationship between her children and their father without replacing it with a legal and more meaningful relationship. In adoption cases our Legislature has determined as a matter of state policy that it is in the best interest of a child to sever the warped or fragmented bond with an unconcerned and unloving natural parent and create a new and permanent bond of parental responsibility and love with someone who truly cares for the child. See In re N, 96 N.J. Super. 415 (App.Div. 1967), and In re Jacques, 48 N.J. Super. 523 (Ch.Div. 1958). But no policy has ever been enunciated by either our appellate courts or our Legislature which denies a noncustodial parent visitation rights.
*304 There is no compelling reason to adopt such a far-reaching policy at this time. For these reasons the father is granted visitation rights, which shall be structured to commence on a limited and restricted basis and shall be expanded as the circumstances warrant.