196 N.J. Super. 487 (1984)
483 A.2d 420
LARRY A. WILKE, PLAINTIFF-APPELLANT,
v.
SHARON M. WILKE CULP, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 2, 1984.
Decided October 22, 1984.
*490 Before Judges MICHELS and PETRELLA.
Stephen C. Carton argued the cause for appellant (Carton, Nary, Witt & Arvanitis, attorneys).
Lawrence D. Kantor argued the cause for respondent (Kantor, Kantor & Kusic, attorneys).
Sidney I. Sawyer argued the cause on behalf of Todd Wilke (Sawyer, Gale & Doyle, attorneys; Mary Ellen Doyle on the brief).
The opinion of the court was delivered by PETRELLA, J.A.D.
*491 Plaintiff Larry A. Wilke appeals from the denial of his 1983 application for visitation with his son born of his marriage to defendant, Sharon Wilke Culp. He had also sought a mediation process to assist implementation of visitation.
On this appeal plaintiff contends that: (1) the trial court's order denying him visitation was in effect an unconstitutional termination of his parental rights; (2) the judge erred by relying solely on the child's preference not to see him in terminating his right to visitation; (3) the judge failed to make proper independent findings of fact as to the best interests of the child; and (4) the judge erred in failing to hold a plenary hearing which would have given the court a basis to evaluate all the issues concerning his visitation request.
The affidavits submitted in connection with the proceedings below contain certain background facts. During the marriage of the parties, a son, Todd Wilke was born on January 12, 1968. Thereafter, on March 24, 1971 the parties were divorced in the state of Indiana. In that proceeding defendant was given custody of Todd Wilke. Plaintiff was granted certain visitation rights. On July 3, 1971 defendant married her present husband, John F. Culp III. Thereafter the Culps relocated to Fort Lee, New Jersey with Todd Wilke. They now reside in Monmouth County.
According to plaintiff, "in the middle of 1971" he experienced difficulties visiting with his son because defendant and her husband intentionally attempted to thwart his efforts at contacting Todd by phone or by written communication. Plaintiff alleges that during this time period defendant and her husband pursued a "cruel and vicious systematic plan" to keep him out of their lives and Todd's life. Plaintiff asserts that they did so by telling Todd malicious things about him so that Todd would reject him, by punishing Todd physically if he kissed, touched or played with or accepted anything from plaintiff and by telling Todd exaggerated stories of physical abuse by plaintiff against *492 defendant. All of this plaintiff claimed was aimed at brainwashing his son into refusing visits.
Defendant denied that she refused plaintiff visitation, and points to a January 28, 1972 letter from her new husband to plaintiff referring plaintiff to their lawyer as their attempt at cooperation in arranging visitation.
In any event, on plaintiff's application an order was entered in Indiana on October 21, 1971 allowing him visitation rights in New Jersey, as well as periods of temporary custody. Plaintiff Wilke thereafter relocated to Florida where he presently resides.
Because of difficulties plaintiff encountered in enforcing his visitation rights, he instituted suit in New Jersey in the Chancery Division (Matrimonial), in Bergen County late in 1972 and obtained a January 29, 1973 order granting him visitation rights on January 31, February 11 and February 21, 1973. On February 27, 1973 plaintiff obtained an order permitting him supervised visitation each Sunday from 2 to 4 p.m. at the Bergen County Children's Welfare Home, known as the "Conklin Home." A March 5, 1973 affidavit from the then superintendent of the Conklin Home stated that when Mr. Culp began bringing Todd to the Conklin Home pursuant to the court order, problems started with Wilke's visitation with his son. The superintendent noted that prior to this time the child had gotten along very well with his father. The boy was then terrified and expressed great fear at being left at the Conklin Home. When this developed John Culp was made a party defendant and the order further required that defendant bring the child to a court designated psychiatrist for an examination. This was done after some delay. One of the reasons the judge ordered a psychiatric examination in 1973 was because "the child expressed fear of his father."
Three psychiatric examinations were conducted and corresponding reports complied. These reports generally indicated that the boy's fear of his natural father and unwillingness to *493 visit with him had been increasing and that this was largely due to what the defendant and her husband had been telling the child. The reports also substantiate the plaintiff's allegations that his son was repeatedly told by the child's mother that plaintiff had injured her. The report of April 5, 1973, based on an examination conducted when Todd was five years old, stated:
When the examiner asked about Larry Wilke, Todd became uneasy and hesitant but did not appear frightened. He said, `The other one is Wilke, he is not my daddy. Mommy does not like Wilke because he pushed her against a stove a long time ago. At that time I was a little baby. Mommy told me about it. Wilke dragged us into Court. Mommy is afraid of him because he hurt her when I was a little kid. Mommy said she does not want me to play with Mr. Wilke. He wanted to put me in Conklin Home and make me sleep there. He tried to take me away. He almost took me in his hands and took me out of the door. I didn't see it. My daddy [Culp] told me he does not like Mr. Wilke.'
Plaintiff's affidavit did contain an admission that he had on one occasion pushed defendant up against a stove during an argument and that this occurred in the child's presence. He also admitted slapping defendant on two occasions, conduct which he claims was intended to bring her to her senses in order to awaken her from a drunken state.
In the report of April 15 the psychiatrist concluded that Todd was unwilling to see his father "not because of any direct negative experience with Larry Wilke, but because of his mother's and stepfather's (especially his mother's) fears and comments in reference to Mr. Wilke." The doctor noted the significant impact that a custodial parent can have in coloring the feelings of a young child toward a separated or divorced parent. His opinion was that "if Todd was permitted visits with his natural father, a good relationship would probably be formed between them." He stressed that for this to succeed, antagonistic feelings should not be shown either verbally or by the attitudes of the adults involved.
The second report dated July 25, 1973, showed that Todd feared that Wilke was going to take him away. The psychiatrist recommended counseling to Mr. and Mrs. Culp. The *494 doctor stated: "It is my opinion, that Todd's negative feelings toward his natural father stem almost entirely from his mother and possibly from Mr. Culp." He declined to say whether this was intentional on their part. The doctor's third visit with the child was on March 13, 1974 about one year after the first visit, and apparently at the request of the Culps. At that time the child was six years of age and was exhibiting even more negative feelings towards his father and was more alienated from him than on the prior consultations. Because these negative feelings had worsened, the doctor recommended severing plaintiff's visitation rights and stated in his report to the court:
In my opinion, the present findings and the current situation is such that Todd's best interests would be served if his relationship with Mr. Wilke were severed. I believe that at this stage of Todd's development proposed visits would heighten his negative feelings towards his natural father, would increase his resistance and conflicts and would probably be detrimental to his emotional well being and development.
The court accepted that recommendation and entered an April 1, 1974 order suspending plaintiff's visitation rights until the further order of the court. On February 10, 1975 an amending order terminated his visitation rights. No appeal was taken from either order. However, matters involving custody and visitation are generally not considered to be final. As stated in Borys v. Borys, 76 N.J. 103, 111 (1978): "Finality has little meaning, however, in the context of child custody adjudication." We consider this principle equally applicable to visitation. On June 24, 1974 an order had been entered requiring the Culps to pay plaintiff's counsel fees of $2,500 and expenses of $200. This was in part because the trial judge "concluded that she [Mrs. Culp] had done all possible to undermine any relationship that could exist between father and son."
In 1977 John Culp made an application to have Todd Wilke's name changed to Culp.[*] Plaintiff objected and that application *495 was denied in Monmouth County where defendant then resided with Todd and three children of her marriage to Culp.
In September 1983 plaintiff filed a motion in the Superior Court, Chancery Division for an order permitting him to visit with his son, and seeking mediation to assist in implementing such visitation. The judge heard oral argument on October 21, 1983 based on the papers filed in connection with the motion and conducted an in camera interview of Todd who was then 15 years old. No testimony was taken of any party and the judge did not order a current probation report or any kind of psychological examination. It was not until January 19, 1984 that the judge in an oral decision denied plaintiff's applications. An order was entered on March 8, 1984 and plaintiff appealed the denial of visitation with his son.
Plaintiff's son Todd will be 17 on January 12, 1985. Todd presently lives with his mother, stepfather and three younger half sisters. Plaintiff currently resides in Florida with his wife and three children by a second marriage. We recognize that at his present age Todd may indeed have developed some strong personal feelings and views, in part based on his environment and the limited experience that his tender years allow. It is doubtful, however, that he would seriously believe that there is any prospect of a change of custody from his mother or that he can be made to live with his natural father. The real questions are the opposite sides of the same coin: Is Todd afraid at this age to meet and confer with his natural father; and should the natural father be denied the opportunity to get to meet and learn about his son first hand? We recognize the complexity of human nature and the strength of emotions such as love and hate, as well as the difficulty of any external force affecting meaningful changes in attitude where stubbornness or conviction hold sway. Likewise courts cannot instill charity and understanding in humans or teach them how to be mature persons. Nor is that our function. People are what they are for good or for bad, but unfortunately may influence others *496 whose lives they touch in subtle ways which are not necessarily in their best interests.
It is well settled that the law favors visitation and protects against the thwarting of effective visitation rights. In re J.S. & C., 129 N.J. Super. 486, 487, 489 (Ch.Div. 1974), aff'd o.b., 142 N.J. Super. 499 (App.Div. 1976); Daly v. Daly, 39 N.J. Super. 117 (Cty.Ct. 1956), aff'd 21 N.J. 599 (1956). In Daly the principle (which has equal application today) was stated that the courts should endeavor that children of separated parents should be imbued with love and respect for both parents, and where children are in custody of one parent, the court should endeavor to effect this facet of the children's welfare by conferring reasonable rights of visitation on the other parent. Id. at 123, citing Turney v. Nooney, 5 N.J. Super. 392, 397 (App.Div. 1949); Bierck v. Bierck, 123 A. 537 (Ch.Div. 1923) (not officially reported); In re Jackson, 13 N.J. Super. 144, 145, 147 (App.Div. 1951).
It has also been held that a parent's rights to the care and companionship of his or her child are so fundamental as to be guaranteed protection under the First, Ninth and Fourteenth Amendments of the United States Constitution. In re J.S. & C., supra, 129 N.J. Super. at 489. Our courts recognize the rights of parents to custody and visitation and hold those rights in high esteem. See e.g., Fantony v. Fantony, 21 N.J. 525 (1956); Brennan v. Brennan, 187 N.J. Super. 351, 357 (App. Div. 1982). Nevertheless, a parent's custody and visitation rights may be restricted, or even terminated, where the relation of one parent (or even both) with the child cause emotional or physical harm to the child, or where the parent is shown to be unfit, see e.g., In re N., 96 N.J. Super. 415, 423-424 (App.Div. 1967); In re J.S. & C., supra, 129 N.J. Super. at 489, or perhaps where special temporary circumstances require, Brennan v. Brennan, supra.
In the case before us the judge determined that the grant of visitation rights to plaintiff would not be in the child's best *497 interest. Hence, as we view it the issue is not as plaintiff argues, whether he has a constitutional right to visit with his son  this is not in dispute. The only issue is whether in attempting to resolve the almost insoluble conundrum of Todd's best interests, the judge erroneously considered the child's desires paramount or erred in denying visitation on the limited record before him.
The parties do not question that a primary concern in determining questions of visitation and custody is the best interests of the child. Fiore v. Fiore, 49 N.J. Super. 219 (App.Div. 1958), certif. den., 28 N.J. 59 (1958); In re J.S. & C., supra, 129 N.J. Super. at 493. Plaintiff argues, however, that in making his decision that visitation would not be in the best interests of Todd, the trial judge relied almost exclusively upon the in camera interview wherein Todd stated his preference not to see plaintiff. In his decision the judge described the child as "an intelligent, mature young man with full capacity to communicate his desires." The judge seemed impressed with the child's statement (which had also been previously submitted in a filed affidavit) that John Culp was the only father he had ever known and that he had not seen his natural father since he was six or seven years old and that he had no recollection of him. Apparently the child made "an emotional plea" to the judge "not to interfere with his present family unit by permitting visitation with a man he has never known."
We question whether that very statement reflects adequate maturity and whether the child's requests were legitimate and not influenced by other members of his residence by past or present conduct. The history of this proceeding, the record of the earlier attempt by plaintiff to obtain visitation and the earlier psychiatric reports, stand in stark contrast to the judge's recent finding that there was no interference or attempt to influence the child by his mother or John Culp. Nor does the judge's decision even address the issue of the effect of past actions and attitudes. The affidavit submitted by plaintiff *498 certainly referred to the background and raised the issue of "brainwashing" by his former wife and John Culp. Furthermore, for a number of years now Todd has lived not only with his mother but also with Mr. Culp. That atmosphere and their influence cannot be disregarded. The papers filed with the court indicated conflicting points of view and as such, the judge should not have made his determination based solely on the filed papers.
Moreover, the evidence of potential influence of the custodial parents draws into question the judge's reliance on the child's stated preference. The preference of the child is only a factor to be given consideration, it is not determinative. Palermo v. Palermo, 164 N.J. Super. 492 (App.Div. 1978); Lavene v. Lavene, 148 N.J. Super. 267, 271 (App.Div. 1977), certif. den. 75 N.J. 28 (1977), on remand 162 N.J. Super. 187 (Ch.Div. 1978). In custody matters where the court must determine which parent will have full-time supervision over the child, courts are required to take into account the desires of the child when the child is "of sufficient age and capacity to reason." N.J.S.A. 9:2-4. Such desires, however, are only to be given "due weight." Id.; see e.g., Callen v. Gill, 7 N.J. 312, 319 (1951); Sheehan v. Sheehan, 38 N.J. Super. 120, 126 (App.Div. 1955); Mayer v. Mayer, 150 N.J. Super. 556, 563 (Ch.Div. 1977). In visitation matters the preference of the child should be subject to closer scrutiny, especially where immature emotions as well as influence by the custodial parent may warrant diminishing the weight to be accorded such preference.
While it is true that the desires of older children may be entitled to stronger consideration than that afforded to younger children, cf. Callen v. Gill, supra, 7 N.J. at 320 ("A 12-year-old child has not attained that ripened discretion which enables him to determine conclusively what his own welfare demands"); but cf. S.M. v. S.J., 143 N.J. Super. 379, 385-386 (Ch.Div. 1976) (granting custody to father substantially on basis that 12-year old expressed a "strong desire" to live with her father, but still *499 affording the mother "liberal visitation"), even a noncustodial parent has the need for the love and affection of his or her child and is entitled to have the parent-child relationship encouraged. In re J.S. & C., supra, 129 N.J. Super. at 491-492.
Aside from the child's statement and the conflicting affidavits, the judge appeared to rely on the fact that the father had delayed at least six years (from the unsuccessful 1977 name change proceeding to the 1983 application) before attempting to enforce his visitation rights. The judge made no findings as to reasons for the delay and did not seem to conclude that delay precluded visitation, but noted that during this time the child had apparently solidified his new ties with his stepfather.
It is true that the plaintiff delayed for a long period of time. For whatever reason he had not formally appealed either the April 1974 ruling of the court suspending visitation or the February 10, 1975 order. It does appear from the filed papers that plaintiff made an attempt to go outside the usual judicial framework by writing letters of objection to officials in the executive branch of government and to the assignment judge. Of course the assignment judge actually has no appeal functions in such matters. Wilke did not raise the issue again until the 1977 attempted name change. Nevertheless, plaintiff has expressed what are reasons for his delay including his nonresidence and the earlier determination of the trial judge, which he apparently reluctantly accepted, that at age six the child might be harmed by forcing visitation. His informal letter application to the then assignment judge did not substitute for an appeal in 1974, but he nonetheless did make efforts at communication with his son which were apparently rebuffed or forbidden. Although we make no findings with respect thereto, such matters may be weighed by the fact finder. If indeed the actions of defendant and her present husband effectively molded the mind of this child against his father, defendant cannot take advantage of that fact by pointing to delay by plaintiff.
*500 The insignificance of the plaintiff's delay is made apparent by the case of Barron v. Barron, 184 N.J. Super. 297, 301 (Ch.Div. 1982). There a divorced father "exerted, at best, minimal efforts to locate and visit his children through [a] five year absence." The father was nonetheless granted visitation rights because there was no evidence that the father would endanger the children either physically or emotionally or that he was an unfit parent. The court clearly rejected the theory that visitation rights can be abandoned. 184 N.J. Super. at 303. The father's five-year absence was considered irrelevant by the court. It cited with approval decisions in other jurisdictions where the delays were longer, but where visitation rights of the noncustodial parent were nevertheless upheld. Id. at 302, citing Radford v. Matczuk, 223 Md. 483, 164 A.2d 904 (1960) (10 years); Aud v. Etienne, 47 Ill.2d 110, 264 N.E.2d 196 (1970) (6 years); Commonwealth ex rel. Boschert v. Cook, 122 Pa.Super. 397, 186 A. 229 (Super.Ct. 1936) (9 to 10 years). See also Commonwealth ex rel. Turner v. Strange, 179 Pa.Super. 83, 115 A.2d 885, 886 (Sup.Ct. 1955) (abandonment irrelevant in visitation case because "[i]t is not the law that a parent who abandons her children loses thereby the right of visitation"). We agree with the reasoning in Barron.
Plaintiff also argues that the trial judge did not consider all the relevant facts, including the safety, happiness, physical, mental and moral welfare of the child as well as the wishes of the parents, the child, the fitness of each parent and the interrelationship of the child with his parents. He argues that the lack of any expert testimony on the subject precluded a proper determination of his visitation rights. Plaintiff further argues that the trial judge failed to make specific fact findings and failed to set forth his conclusions as required by R. 1:7-4. Although the Rule refers generally to nonjury cases, the purpose and philosophy of this Rule, as well as R. 4:46-2 requires such findings to be made even where there is no formal trial. Here, the issue was effectively tried despite the lack of a plenary hearing. The judge did make some findings with *501 respect to visitation, but it appears that the child may have been concerned with the potential change of custody (which was not in issue) or some form of unpleasant confrontation or visitation. Moreover, the judge incorrectly appeared to give weight to the fact that plaintiff did not immediately challenge the termination of his rights when he concluded his findings with reference to plaintiff's delay of about six years in seeking to assert visitation rights. We conclude that the evidence presented in the proceedings below was not based on the types of proofs from which it could be clearly and convincingly demonstrated that the reinstatement of plaintiff's visitation rights would cause physical or emotional harm to the child.
The effect of the judge's ruling denying plaintiff visitation is to cut off forever the child from his natural parent. See In re Adoption of Children by D., 61 N.J. 89, 93 (1972). The court's order was based almost exclusively on the child's stated preference and the conflicting affidavits. It is basic that a case should not be decided merely on the basis of conflicting affidavits, Fusco v. Fusco, 186 N.J. Super. 321, 327-329 (App.Div. 1982); Wagner v. Wagner, 165 N.J. Super. 553 (App.Div. 1979), certif. den. 85 N.J. 93 (1980); Tancredi v. Tancredi, 101 N.J. Super. 259, 262 (App.Div. 1968), or an inadequate record. That is what occurred here. There was no plenary hearing to develop the facts and there was no current probation report or psychological reports.
In addition, the child here was represented by an attorney hired by his stepfather, rather than by an independent guardian ad litem appointed by the court. Under the circumstances the trial judge should have ordered "independent representation" for the child. See In re Mercado Adoption, 182 N.J. Super. 628-630 (App.Div. 1982). As we said in In re Adoption by J.J.P., 175 N.J. Super. 420, 429 (1980):
... [I]t is obvious that the counsel for the litigating parties are adversaries whose primary allegiance must be to the cause espoused by their clients, plaintiff stepfather and defendant natural father. The children are clients of neither of them. However, they are the center of the controversy and were *502 entitled to independent counsel who, in protecting their welfare and interests, could be objective with regard to the issues and contentions of the parties. Our courts have inherent power to appoint a guardian ad litem for a minor, R. 4:26-2, and the desirability of the exercise of such power is recognized in our decisions. In re N., supra, 96 N.J. Super. at 427-428. We are satisfied that the circumstances involved in this contested adoption proceeding justified the appointment of independent counsel to act as guardian ad litem on behalf of the children.
See also Doe v. State, 165 N.J. Super. 392, 406-408 (App.Div. 1979). Although we do not criticize the attorney who had represented the child in these proceedings, we cannot conclude that an attorney hired by the stepfather is the type of independent counsel contemplated by R. 4:26-2 and the cited case. The stepfather and his interests are obviously and naturally aligned with the defendant's interests. In addition, the filed papers clearly spell out allegations against John Culp which are contrary to the interests of plaintiff.
The natural father in this case seeks only minimal visitation rights and has expressed a willingness to take part in a mediation process to devise a visitation schedule acceptable to all parties. We are satisfied that under the circumstances, before the drastic step was taken of effectively terminating plaintiff's rights of visitation, a plenary hearing with testimony of the parties and other necessary witnesses was required. Only under such circumstances can an accurate determination be made of what is in Todd's best interest. See Sheehan v. Sheehan, supra, 38 N.J. Super. at 127 (where welfare of children is concerned it is court's duty to ground its judgment on the best interest of the child, a determination which can be made only "by a full and complete hearing on all issues"); see also Wagner v. Wagner, supra, 165 N.J. Super. at 557; Kattermann v. DiPiazza, 151 N.J. Super. 209, 214 (App.Div. 1977).
The trial judge apparently accepted without question that there is no room in the boy's life for the natural father. In times such as these when divorce is unfortunately so widespread, it is not, and need not be unusual for both a father and a stepfather to maintain a good relationship with a child *503 through the exercise of understanding and compassion. See In re Adoption of the Children of D., supra, 61 N.J. at 98; In re Mercado Adoption, supra, 182 N.J. Super. at 631. It must be borne in mind that there is no question here of uprooting a child from a secure family setting. Nor are we dealing with a young impressionable child. The child here is rapidly approaching age 17 and should be capable of dealing with daily events on an adult level. At least the record in this case does not indicate that he is unable to do so.
In sum we hold that, notwithstanding the present age of the child, the father's visitation rights should not have been denied unless it clearly and convincingly appeared that this was one of those exceptional cases where visitation would have caused physical or emotional harm to the children, or where it was demonstrated that the noncustodial parent was unfit. See Fantony v. Fantony, supra, 21 N.J. at 536; Brennan v. Brennan, supra, 187 N.J. Super. at 357; In re Adoption by J.J.P., supra, 175 N.J. Super. at 426; Barron v. Barron, supra, 184 N.J. Super. at 301. We see no such evidence in this case.
Under our Rules issues relating to custodial status of minors, and we construe this to include visitation, are entitled to a preference on the calendar. R. 1:2-5(1) and (5). It is indeed unfortunate that so much time has elapsed already. That, however, should not preclude a proper inquiry. Hence, we direct that a plenary hearing on the issue of plaintiff's entitlement to visitation be promptly conducted. Such proceedings shall commence within 30 days of this decision and proceed day to day until concluded.
Furthermore, the trial judge shall promptly appoint a guardian an ad litem to represent Todd (see R. 4:26-2). At the plenary hearing the judge should explore, among other things, whether plaintiff's lack of past visitation and Todd's attitude are attributable to the child's mother and stepfather. If necessary, appropriate measures to provide counseling services to the parties, the child and even the stepfather may be warranted.
*504 Reversed and remanded for a plenary hearing to determine whether plaintiff is entitled to visitation, considering the best interests of the child, in conformity with our opinion, and if so what conditions, if any, should be imposed by the court for such visitation. At such hearing the court may consider the testimony of any qualified psychologist or expert proffered by the parties or appointed by the court. Jurisdiction is not retained.
NOTES
[*] There apparently was a prior adoption complaint filed by the Culps in Bergen County which was withdrawn when it became apparent that adoption would be contested.